## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALLYSON SMITH, | |
| Plaintiff, | CIVIL ACTION NO. 3:15-cv-00089-SRU |
| v. | |
| WELLS FARGO BANK, N.A., | |
| Defendant. | September 30, 2015 |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

Defendant Wells Fargo Bank, N.A., ("Wells Fargo"), respectfully submits this memorandum of law in support of its motion to dismiss the Second Amended Complaint of Plaintiff Allyson Smith pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiff claims that she is entitled to rescind her mortgage loan with Wells Fargo because certain of the loan's disclosures allegedly violated the Truth in Lending Act, 15 U.S.C. §1601, *et seq.* ("TILA").  She seeks damages for Wells Fargo's refusal to honor her rescission request.  Plaintiff also alleges that Wells Fargo's representations and disclosures regarding the costs and fees for her mortgage loan violate the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.* ("CUTPA").

The loan's disclosures do not violate TILA, and Plaintiff's right to rescind expired in 2012.  Additionally, Plaintiff fails to state a claim under CUTPA, and even if she has her purported CUTPA claim is preempted by federal law.  These defects cannot be cured by amendment.  Therefore, the Court should dismiss the Amended Complaint with prejudice.

## I.   PROCEDURAL BACKGROUND

Plaintiff served the original Complaint on Wells Fargo on January 26, 2014, in which she asserted claims for "enforcement of Plaintiff's rescission rights" (Count I) and "claim for defendant's violation of TILA by failing to honor plaintiff's rescission request"  (Count II).  (D.E. 1.)

On March 18, 2015, 2015, Wells Fargo answered the original Complaint.  (D.E. 18.)  On that date, Wells Fargo also moved for judgment on the pleadings on all Counts.

On April 8, 2015, while Wells Fargo's motion for judgment on the pleadings was pending, Plaintiff filed the Amended Complaint.  (D.E. 41.)

On May 11, 2015, Wells Fargo withdrew its motion for judgment on the pleadings as to the original Complaint.  (D.E. 31, 32.)

On May 27, 2015, Wells Fargo moved to dismiss the Amended Complaint.  (D.E. 33, 34.)  On August 17, 2015, while Wells Fargo's motion to dismiss the Amended Complaint was pending, Plaintiff filed her Second Amended Complaint ("Second Amended Complaint" or "SAC").  (D.E. 41.)

The Second Amended Complaint asserts claims for "enforcement of Plaintiff's rescission rights," based on Wells Fargo's alleged failure to provide a Notice of Right to Cancel with the correct expiration date (Count I); "violation of TILA by failing to honor plaintiff's rescission request" (Count II); and "violation of CUTPA" based on Wells Fargo "(a) misrepresenting the amount that was required to pay off the Raveis Loan; (b) misrepresenting the escrow balance on the HUD-1 provided to Plaintiff; and (c) misrepresenting to Plaintiff that the Wells Fargo Loan would not have any hidden fees when, in fact, the Wells Fargo Loan contains hidden fees." (Count III).

2

II.     ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

According to the Second Amended Complaint, on June 16, 2008, Plaintiff purchased the property located at 456 Ruth Street, Bridgeport, Connecticut (the "Property").  (SAC at ¶ 6.)  To finance the purchase of the property, she entered obtained a loan from William Raveis Mortgage, LLC for $132,000.00, which was secured on the Property (the "Raveis Loan" or the "Raveis Mortgage").  (*Id.* at ¶¶ 7-9.)  The Raveis Loan had a 30 year term with a fixed rate of 6.375% and required Plaintiff to make monthly principal and interest payments of $823.51 as well as monthly escrow payments for taxes and insurance.  (*Id.* at ¶¶ 10-11.)  After Plaintiff purchased the Property, Wells Fargo became the servicer of the Raveis Loan.  (*Id.* at ¶ 12.)  Plaintiff timely made all payments on the Raveis Loan using an autodraft payment feature.  (*Id.* at ¶¶ 13-14.)

In February 2012, Plaintiff contacted Wells Fargo to refinance the Raveis Loan under the Home Affordable Refinance Program ("HARP") and, sometime thereafter, applied to refinance the Raveis Loan.  (*Id.* at ¶¶ 16-17.)

Plaintiff alleges that on or about February 21, 2012 and February 27, 2012, Wells Fargo employees left Plaintiff voicemail messages advising her that Wells Fargo would send her the closing documents for the HARP refinance after Plaintiff made the March 2012 payment on the Raveis Loan.  (*Id.* at ¶18.)  Plaintiff asserts she made her March, 2012 payment on the Raveis Loan on March 1, 2012 through autodraft and Wells Fargo posted it on the same date.  (*Id.* at ¶ 19.)  She alleges that on or about March 5, 2012, Lataska Troutman ("Ms. Troutman"), a Wells Fargo employee, left a telephone message for Plaintiff telling her to continue making payments on the Raveis Loan (including the April 1, 2012 payment) until Plaintiff was notified that her HARP Loan had been approved for funding.  (*Id.* at ¶ 20.)

Plaintiff claims that on or about March 9, 2012, she received a "Close at Home Mortgage Kit" (the "Mortgage Kit") from Wells Fargo, which contained, among other documents, copies of:

(1) the note in the amount of $126,648.85 (the "Note"), dated March 31, 2012;

(2) the mortgage, dated March 31, 2012 (the "Mortgage") (the Note and Mortgage are referred to collectively as the "Wells Fargo Loan" and are attached hereto as Exhibits 1 and 2, respectively);

(3) two copies of a "Notice of Right to Cancel" (SAC, Ex. A);

(4) a Federal Truth-in-Lending Disclosure Statement ("TILA Disclosure Statement"), dated March 8, 2012 (SAC, Ex. B);

(5) a HUD-1 Settlement Statement ("HUD-1") (SAC, Ex. C);

(6) a cover letter from Kristie Lewis, a representative of Wells Fargo, describing the Wells Fargo Three-Step Refinance SYSTEM, stating that there were "no closing costs or hidden fees the Wells Fargo Three-Step Refinance SYSTEM" and instructing Plaintiff to skip the April payment on the Raveis Loan (the "Cover Letter") (SAC, Ex. D);

(7) a document entitled "Frequently Asked Questions About the Wells Fargo Three-Step Refinance SYSTEM®" ("FAQs") (SAC, Ex. E); and

(8) a document entitled "Borrower Acknowledgements, Agreements and Disclosures." (Attached hereto as Exhibit 3.)

(*Id.* at ¶¶ 21-29.)  Plaintiff asserts she executed all of the documents included in the Mortgage Kit on March 13, 2012, and returned them to Wells Fargo.  (*Id.* at ¶ 30.)  She pleads that on March 30, 2012, Ms. Troutman called and spoke to her, and advised her that the Wells Fargo Loan had been approved for funding and that she could skip her April 2012 payment and cancel the autodraft on the Raveis Loan for the April 1, 2012 payment.  (*Id.* at ¶ 31.)

Plaintiff alleges that the Wells Fargo Loan contains hidden fees and costs.  (*Id.* at ¶ 32.) She claims that Wells Fargo misrepresented the amount that was required to pay off the Raveis Loan.  (*Id.*)  Plaintiff claims that Line 104 of the HUD-1 shows a payoff amount of $126,648.85,

but that the actual principal balance due on the Raveis Loan after she made her March 1, 2012 payment was only $125,957.92, for a difference of $690.93. (*Id.* at ¶¶ 33-35.) Plaintiff claims that this $690.93 amount consists of a $53 recording fee paid to the City of Bridgeport Town Clerk and capitalized $637.93 of interest in the Raveis Loan payoff amount. (*Id.* at ¶ 36.) Plaintiff asserts that neither of these capitalized amounts was disclosed to her in the closing documents and that Wells Fargo did not give her the option of paying those fees upfront instead of having those fees capitalized into the Wells Fargo Loan. (*Id.* at ¶ 37.)

Plaintiff claims that Wells Fargo's failure to disclose that it would add this $690.99 amount to the principal balance of the Wells Fargo Loan results in her paying a hidden fee in the form of additional interest in amount of $495.91 over the life of the Wells Fargo Loan, and that this additional interest constitutes a "hidden fee." (*Id.* at ¶ 38-39.)

Plaintiff alleges that, because Wells Fargo processed Plaintiff's March 1, 2012 payment the same day it was received, it knew the exact amount of her escrow balance on the Raveis Loan on Mach 1, 2012 was $2,118.35. (*Id.* at ¶ 40.) Despite this alleged knowledge, Plaintiff claims that Wells Fargo prepared the HUD-1 it sent to her on March 9, 2012, which indicated on line 1001 the balance of Plaintiff's escrow account to be $2,613.90. (*Id.* at ¶ 41.) According to Plaintiff, Wells Fargo's alleged misrepresentation of the escrow balance on the HUD-1 resulted in Wells Fargo stating that Plaintiff's monthly payment beginning May 1, 2012 would be $1,052.87 including taxes and insurance, but that Wells Fargo later increased Plaintiff's monthly payment by $36.86 per month beginning with Plaintiff's June 1, 2012 payment. (*Id.* at ¶ 42.)

Plaintiff claims that the Notice of Right to Cancel reflects an incorrect expiration date. The Notice of Right to Cancel indicated that the "date of the transaction" was March 26, 2012, and also stated that Plaintiff had until March 29, 2012 to exercise her right to rescind the loan

with Wells Fargo.  (*Id.* at ¶¶ 43-44, Ex. A.)  Plaintiff alleges that she did not become contractually obligated on the Wells Fargo Loan until March 30, 2012, because that is the date that Ms. Troutman called Plaintiff and advised her that the Wells Fargo Loan was approved and that she was not required to make the April 2012 payment on the Raveis Loan.  (*Id.* at ¶ 45.)  Thus, Plaintiff claims her three day right to cancel expired no earlier than April 4, 2012.  (Id. at ¶ 46.)

On October 21, 2014, Plaintiff's counsel sent Wells Fargo a letter purporting to give notice of her election to rescind the Wells Fargo Loan.  (*Id.* at ¶ 47, Ex. F.)  Wells Fargo sent a response letter to Plaintiff's counsel, dated October 30, 2012, stating that the Wells Fargo Loan was not eligible for rescission.  (*Id.* at ¶ 48, Ex. G.)  Plaintiff alleges that she is "ready, willing and financially able to tender the proceeds of the [Wells Fargo Loan] to [Wells Fargo] after the Court determines the amount of Plaintiff's tender obligation."  (*Id.* at ¶ 49.)

Based on these allegations, Plaintiff asserts causes of action for  "enforcement of Plaintiff's rescission rights" (Count I); "claim for defendant's violation of TILA by failing to honor plaintiff's rescission request" (Count II) and violation of CUTPA (Count III).  (*Id.* at ¶¶ 51-62, 63-66, 67-73.)

With respect to Count I, Plaintiff claims that she is entitled to rescind the Wells Fargo Loan because the Notice of Right to Cancel should have indicated that her three-day right to rescind under TILA expired on April 4, 2012 – not March 29, 2012 – and as a result her right to rescind extended from three days to three years.  (*Id.* at ¶¶ 56-62.)

With respect to Count II, Plaintiff claims that Wells Fargo's failure to honor Plaintiff's request to rescind the Wells Fargo Loan constitutes an independent violation of TILA. (*Id.* at ¶ 66).

With respect to Count III, Plaintiff claims Wells Fargo violated CUTPA by: (a) misrepresenting the amount that was required to pay off the Raveis Loan; (b) misrepresenting the amount of Plaintiff's escrow balance on the HUD-1 provided to Plaintiff; and (c) misrepresenting to Plaintiff that the Wells Fargo Loan would not have any hidden fees when, in fact, the Wells Fargo Loan contains hidden fees. (*Id*. at ¶¶ 70-73.)

For Counts I and II, Plaintiff seeks a declaration that she is entitled to rescind the Wells Fargo Loan; that Wells Fargo is required to return any money given by Plaintiff to anyone in connection with the Wells Fargo Loan; and that Wells Fargo's security interest in the Property is void. (*Id.*, Prayer for Relief.) She asks the Court to order Wells Fargo to take all necessary actions to terminate any security interest in the Property and to return any money or property given by Plaintiff in connection with the Wells Fargo Loan. (*Id*.) She also requests the Court to order that Plaintiff has no duty to tender the Wells Fargo Loan proceeds to Wells Fargo. In the alternative, if the Court finds that tender is required, Plaintiff asks the Court to determine the amount of Plaintiff's tender in light of her claims, and order Wells Fargo to accept the amount determined by the Court. (*Id*.) Finally, Plaintiff seeks statutory and actual damages based on Wells Fargo's alleged failure to honor her rescission request, as well as attorney's fees and costs. (*Id*.) For Count III, Plaintiff seeks actual damages, attorneys' fees and costs, punitive damages, any and/or all relief under CUTPA. (*Id*.)

## III.   ARGUMENT

### A.   Legal Standard

To survive a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173

L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (citation omitted).  Also, a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* Where "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

"[I]n determining the adequacy of a claim under Rule 12(b)(6), a court may consider facts stated on the face of the complaint, 'documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.'"  *Sarno v. Midland Credit Mgmn't, Inc.*, No. 10Civ4704, 2011 WL 349974, at *1 (S.D.N.Y. Jan. 31, 2011) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).  "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."  *DiFolco v. MSNBC Cable, L.L.C.*, 622 F.3d 104 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  "If these documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint."  *Rapoport v. Asia Electronics Holding Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

Further, a District Court may properly take judicial notice of documents that are "publicly available" during the litigation, *Finn v. Barney*, 471 Fed. Appx. 30, 31 (2d Cir. 2012), such as "[p]ublic filings," *U.S. v. American Soc. of Composers, Authors and Publishers*, 627 F.3d 64, 69,

n. 2 (2d Cir. 2010), and other "public record[s]," *Niagara Mohawk Power Corp. v. Chevron*

*U.S.A., Inc.*, 596 F.3d 112, 124, n.2 (2d Cir. 2010).

**B.      Plaintiff Fails To State A Claim Under Count I.**

**1.      Statutory Framework**

TILA's purpose is to "assure a meaningful disclosure of credit terms" to permit a

consumer to "compare more readily the various credit terms available to him and avoid the

uninformed use of credit."  15 U.S.C. § 1601(a).  When, as alleged here, a loan is to be secured

by a consumer's principal dwelling, TILA provides for a three-day cooling-off period during

which the consumer may rescind the transaction, and requires the lender to inform the borrower

of his or her rescission rights:

> (a) Disclosure of obligor's right to rescind
>
> Except as otherwise provided in this section, . . . the obligor shall have the right to
> rescind the transaction until midnight of the third business day following the
> consummation of the transaction or the delivery of the information and rescission
> forms required under this section together with a statement containing the
> material disclosures required under this subchapter, whichever is later, by
> notifying the creditor, in accordance with regulations of the Bureau, of his
> intention to do so.
> * * * *
> The creditor shall clearly and conspicuously disclose, in accordance with
> regulations of the Bureau, to any obligor in a transaction subject to this section the
> rights of the obligor to exercise his right to rescind any transaction to this section.

15 U.S.C. § 1635(a); 12 C.F.R. § 1026.23 (effective between Dec. 30, 2011 and May 31, 2013).[1]

Regulation Z ("Reg. Z") implements TILA's detailed disclosure requirements.  It

provides, with respect to the form and content of the notice:

> [A] creditor shall deliver two copies of the notice of the right to rescind to each
> consumer entitled to rescind . . . .  The notice  shall be on a separate document
> that identifies the transaction and shall clearly and conspicuously disclose the
> following:

---

[1] Plaintiff entered into the Wells Fargo Loan on March 13, 2012.

(i) The retention or acquisition of a security interest in the consumer's principal dwelling.

(ii) The consumer's right to rescind the transaction.

(iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(iv) The effects of rescission, as described in paragraph (d) of this section.

(v) The date the rescission period expires.

(2) Proper form of notice. To satisfy the disclosure requirements of paragraph (b)(1) of this section, *the creditor shall provide the appropriate model form in Appendix H of this part or a substantially similar notice.*

*Id.* at § 1026.23(b)(1) (emphasis added); *see also* 12 C.F.R. § Pt. 1026, App. H-8 (effective December 30, 2011 to January 9, 2014).

Reg. Z, 12 C.F.R. §§ 1026.1-1026.29, provides in relevant part, that:

The consumer may exercise the right to rescind until midnight of the third business day following *consummation*, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last . . . .

*Id.* at § 1026.23(a)(3)(i) (effective between Dec. 30, 2011 and May 31, 2013) (emphasis added).

Reg. Z further provides that "[i]f the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first." *Id.* at § 1026.23(a); *see* Reg. Z Official Interpretations 12 C.F.R. § Pt. 1026.23(a)(3)-3, Supp. I, Part 2.

For purposes of the consumer's right to rescind, "[t]he term 'material disclosures' means the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosures and limitations referred to in §§

1026.32(c) and (d) and 1026.35(b)(2).  *See* 12 C.F.R. § 1026.23(a)(3)(ii) (effective June 1, 2013 to January 9, 2014).[2]

Here, Plaintiff alleges that Wells Fargo failed to provide the required material disclosures and that she is thus entitled to rescind the Wells Fargo Loan because the notice of right to cancel should have listed April 4, 2012 as the expiration date, not March 29, 2012.  Plaintiff's claim fails as a matter of law.

### 2.      The Notice of Right to Cancel Does Not Violate TILA

The Complaint asserts that Wells Fargo provided the Notice of Right to Cancel to Plaintiff when it sent her the "Close at Home Mortgage Kit" on March 9, 2012.  (SAC at ¶ 21, Ex. A.)  The Wells Fargo Loan was consummated on March 13, 2012, when Plaintiff signed the Note and Mortgage.  (*Id.* at ¶ 30) ("Plaintiff executed all of the documents included in the Mortgage Kit on March 13, 2012, and sent them to Wells Fargo several days thereafter"); *see* 12 C.F.R. § 1026.2(a)(13) (defining "consummation" as "the time that a consumer becomes contractually obligated on a credit transaction").

Plaintiff's contention that the she became contractually obligated on the Wells Fargo Loan on March 30, 2012 (when Ms. Troutman called Plaintiff to tell her that the Wells Fargo Loan was approved), and that the Notice of Right to Cancel should have reflected an expiration date of April 4, 2012, is incorrect as a matter of law.  The Second Circuit, in interpreting "consummation" under TILA, has held that a "transaction is consummated when the lender and borrower sign a contract obligating them, respectively, to lend and to borrow the funds." *Murphy v. Empire of America, FSA*, 746 F.2d 931, 934 (2d Cir. 1984).  The Official Staff Interpretation of Regulation Z notes that state law determines when a borrower becomes

---

[2] TILA contains a broader definition of "material disclosures" that is inapplicable here.  *See* 15 U.S.C. § 1602(v).

contractually obligated.  12 C.F.R. § Pt. 1026.23(a)(33)-1.  It is settled law in Connecticut that "[t]o form a contract, generally there must be a bargain in which there is a manifestation of mutual assent to the exchange between two or more parties . . . .  The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act . . . .  [The] agreement . . . requires a clear and definite promise."  *Bartomeli v. Bartomeli*, 65 Conn. App. 408, 414, 783 A.2d 1050 (2001) (citations and internal quotation marks omitted); *see also Bank of New York v. Conway*, 50 Conn. Supp. 189, 199-200, 916 A.2d 130, 138 (Conn. Super. Ct. 2006) (interpreting TILA and Connecticut law on contract formation, holding that "the loan was consummated on March 22, 2000, when the defendants signed a contract binding them to borrow and repay funds").

Here, Plaintiff admits in her Second Amended Complaint that she signed the Note and Mortgage on March 13, 2012.  (*See* SAC ¶ 28; *see also* Note (Ex. 1) and Mortgage (Ex. 2)).  Thus, according to her allegations the Wells Fargo Loan was consummated and Plaintiff became contractually obligated under the Wells Fargo Loan on March 13, 2012.

Any contention that Plaintiff's contractual obligation on the Wells Fargo Loan was not triggered until Ms. Troutman called her on March 30, 2012 is incorrect as a matter of law and contradicted by the express terms of the Note.  *See Murphy*, 746 F.2d at 934 (transaction is consummated when borrower signs the contract); Note at ¶ 8 (any person who signs the Note "is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.").  Nothing in the Note or Mortgage provides Plaintiff will become obligated when she receives Ms. Troutman's courtesy call.  They contemplate Plaintiff's obligation being triggered upon her execution the documents.  (*See* Note at ¶ 8; Mortgage at 14 ("BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in

this Security Instrument . . . .") (bold in original).  Indeed,  Plaintiff could not have become contractually obligated on the Wells Fargo Loan from Ms. Troutman's telephone call because all contracts concerning interests in real property must be in writing.  *See, e.g., L & R Realty v. Connecticut Nat. Bank*, 53 Conn. App. 524, 541, 732 A.2d 181, 189 (1999) (holding that mortgagee's oral subordination agreement was not enforceable under Connecticut law, stating "[o]ur statute of frauds, General Statutes § 52–550, requires that every agreement or memorandum of an agreement 'for the sale of real property or any interest in or concerning real property' be in writing and signed by the party to be charged in order for a civil action to be maintained against that party."); *Zewinski v. Volpe*, No. CV980488391S, 2001 WL 752701, at *7 (Conn. Super. Ct. June 4, 2001) ("oral agreements concerning interests in real property are unenforceable") (citing *L & R Realty, supra).*

Accordingly, because Plaintiff became contractually obligated on March 13, 2012, TILA and Reg. Z required that Plaintiff be afforded until *at least* March 16, 2012 to cancel the Wells Fargo Loan.  *See* 15 U.S.C. § 1635(a); 12 C.F.R. § 1026.23(a).  The Notice of Right to Cancel provides a rescission deadline of March 29, 2012; thirteen *more* days than the three-day minimum period that TILA requires.

Wells Fargo's providing Plaintiff with more than three days to exercise her right to cancel the Wells Fargo Loan is not a TILA violation – providing a borrower with more than the minimum three day cancellation period does not violate TILA.  *See, e.g., Hawaii Cmty. Fed. Credit Union v. Keka*, 94 Haw. 213, 11 P.3d 1 (2000) (lender materially complied with TILA and Regulation when it gave borrower more than three days to rescind); *Kramer v. Home Sav. of Am., FSB*, 721 So. 2d 1239, 1240 (Fla. Dist. Ct. App. 1998) (same, observing that "TILA does not prevent a lender from giving a borrower greater rights than the statute requires"); *Swayze v.*

*Ameriquest Mortgage Co.*, No. 1:03-CV-733-WSD, 2005 WL 6763571, at *2 (N.D. Ga. Feb. 16, 2005) (notice setting forth additional contractual one-week right to rescind neither undermines nor renders confusing TILA's three-day right to rescind, stating that "Plaintiffs' argument that this additional contract right wrongfully confused Plaintiffs regarding their statutory rights is not persuasive or logical" and that "Plaintiffs were not required to give up any portion of their statutory rescission period"); *see also Palmer v. Champion Mortg.*, 465 F.3d 24, 29 (1st Cir. 2006) (finding no violation where notice listed incorrect deadline for rescission because the alternative deadlines rendered the notice not misleading); *Lahoud v. Countrywide Bank FSB*, No. 3:07CV01616 DJS, 2012 WL 1067391, at *9 (D. Conn. Mar. 30, 2012) (following *Palmer* and finding no violation even where the notice of right to cancel included incorrect dates); *Melfi v. WMC Mortg. Corp.*, 568 F.3d 309 (1st Cir. 2009) (notice that omits transaction date does not entitle three-year rescission when a reasonable borrower could not have been misled, technical deficiencies do not matter if the borrower receives a notice that effectively gives him notice as to the final date for rescission and has the three full days to act); *Ward v. Lime Fin. Servs., Ltd.*, No. CIVA 09-00057-KD-N, 2009 WL 3425676, at *5 (S.D. Ala. Oct. 22, 2009) (refusal to follow hyper-technical approach to TILA; as a reasonably attentive consumer would know when rescission expires, blank expiration date does not provide for extended rescission).

The case of *Hawaii Cmty. Fed. Credit Union* is directly on point.  There, plaintiffs sought to rescind their Wells Fargo Loan where the notice of right to cancel listed a transaction date of June 7, 1994, and an expiration date of June 13, 1994.  94 Haw. at 226.  Plaintiffs insisted that TILA required that the notice state June 10, 1994 as the expiration date.  *Id.*  The Supreme Court of Hawaii rejected plaintiffs' argument and explained:

> [A]lthough the regulation entitles the consumer to rescind "until midnight of the third business day following consummation," it merely directs the creditor

"clearly and conspicuously" to disclose "the date the rescission period expires."
Inasmuch as a disclosure that recites a date later than the third business day
following the date of the transaction as being "the date the rescission period
expires" does not prejudice the consumer's statutory right of rescission, but
actually benefits the consumer by extending the rescission period, we hold that
such a disclosure materially complies with 12 C.F.R. § 226.23(b)(v).

*Id.*

*Palmer* is also instructive.  In *Palmer*, the notice of the right to rescind was received after April 1, 2003, which was the expiration date listed on the notice.  *Id.* at 25-26.  The United States Court of Appeals for the First Circuit found the notice not to be defective because it also followed TILA's language that: ". . . you have a legal right to cancel . . . within 3 business days from *whichever . . . occurs last* . . . (1) the date of the transaction . . . (2) the date you received your Truth In Lending disclosures, or (3) the date you received this notice of your right to cancel."  *Id.* at 29 (emphasis added).  The court held a consumer is deemed as a matter of law to understand this language to mean that the right to cancel expires 3 days from the last of these events to occur.  *Id.*

Here as well, the Notice of Right to Cancel contained the standard language that Plaintiff had the right to rescind within three business days from whichever of the following events occurs last: (1) "the date of the transaction, which is March 26, 2012;" (2) the date she received the TILA Disclosure Statement; or (3) the date Plaintiff received the Notice of Right to Cancel.  *See* SAC., Ex. A.  Plaintiff alleged in the SAC that she received the TILA Disclosure Statement and Notice of Right to Cancel with her Close at Home Mortgage Kit on March 9, 2012.  (*See* SAC. ¶¶ 21, 24-25.)  Thus, the last event to occur listed on the Notice of Right to Cancel was the March 26 "transaction date" and, consequently, the expiration date was listed as March 29.  (*Id.* Ex. C.)  Even though the Notice of Right to Cancel allegedly incorrectly listed the transaction date as March 26 instead of March 13 (when Plaintiff became contractually obligated), the

15

claimed error provided Plaintiff with thirteen *more* days to cancel the Wells Fargo Loan, thus

*benefitting* her.  Wells Fargo's Notice of Right to Cancel complied with TILA.  *See Palmer*, 465

F.3d at 29; *Hawaii Cmty. Fed. Credit Union,* 94 Haw. at 226; *Kramer*, 721 So. 2d at 1240;

*Swayze,* 2005 WL 6763571, at *2.

### 3.      Plaintiff's Rescission Claim Is Time Barred.

As discussed above, Reg. Z affords consumers "the right to rescind until midnight of the

third business day following consummation, delivery of the notice required by paragraph (b) of

this section, or delivery of all material disclosures, whichever occurs last . . . ."  12 C.F.R.

§ 1026.23(a)(3)(i) (effective between Dec. 30, 2011 and May 31, 2013).  And it provides that

"[i]f the required notice or material disclosures are not delivered, the right to rescind shall expire

3 years after consummation, upon transfer of all of the consumer's interest in the property, or

upon sale of the property, whichever occurs first."  *Id.* at § 1026.23(a); *see* Reg. Z Official

Interpretations 12 C.F.R. § Pt. 1026.23(a)(3)-3, Supp. I, Part 2.

Plaintiff avers in the Complaint that she did not attempt to rescind until October 21, 2014.

(SAC ¶ 47.)  She seeks to extend the period to three years on the grounds that Wells Fargo did

not deliver certain "material disclosures" because, she claims, the Notice of Right to Cancel

stated the incorrect expiration date.  (*Id.* ¶¶ 56-62.)  But as demonstrated above Wells Fargo

provided her with all of the material disclosures TILA required.  Therefore, Plaintiff's right of

rescission cannot be extended from three days to three years.  Her rescission claim is time barred.

It expired without having been timely exercised on March 29, 2012.

C.     **Plaintiff Fails To State A Claim Under Count II.**

Plaintiff seeks damages under TILA, 15 U.S.C. § 1635(b),[3] for Wells Fargo's refusal to allow her to rescind the Wells Fargo Loan.  (*See* SAC ¶¶ 63-66.)  As demonstrated above, Plaintiff is not entitled to rescind it.  Absent a valid right to rescind, no action for damages for the refusal to allow a rescission exists.

D.     **Count III Fails As A Matter Of Law.**

1.     **Plaintiff Fails To State A Claim Under CUTPA**

a.     **Standard on CUTPA claims**

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[4]  A violation of CUTPA may be established by "showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy . . . .  [I]n order to enforce this prohibition, CUTPA

---

[3] Title 15, U.S.C. § 1635(b) provides:

(b) Return of money or property following rescission

When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission.  Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.

[4]  The Connecticut Supreme Court has adopted the criteria set out in the so-called "cigarette rule" by the Federal Trade Commission (first articulated in 1964 in connection with the FTC's rule governing the advertising and sale of cigarettes) for determining when a practice is unfair:  "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise -- in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . .  All three criteria do not need to be satisfied to support a finding of unfairness."  *Harris v. Bradley Memorial Hospital & Health Center, Inc*., 296 Conn. 315, 350 (2010).

provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . ." *Kosiorek v. Smigelski*, 112 Conn. App. 315, 321-22, *cert. denied*, 291 Conn. 903 (2009).  "[I]n order to prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act and that, as a result of this act, the plaintiff suffered an injury." *Stevenson Lumber Co.-Suffield, Inc. v. Chase Associates, Inc*., 284 Conn. 205, 214 (2007).  p. 550, 565-66 (2009).  "A claim under CUTPA must be pleaded with particularly to allow evaluation of the legal theory upon which the claim is based."  *S.M.S. Textile Mills, Inc. v. Brown, Jacobson, Tillinghast, Lahan & King, P.C.*, 32 Conn. App. 786, 797 (1993) (internal quotation marks omitted).

### b.   Plaintiff's CUTPA Claims Based On Alleged "Hidden Fees" Fail As A Matter Of Law.

Plaintiff's claims that Wells Fargo violated CUTPA by "misrepresenting the amount that was required to pay off the Raveis Loan," and "misrepresenting to Plaintiff that the Wells Fargo Loan would not have any hidden fees when, in fact, the Wells Fargo Loan contains hidden fees," are premised on Wells Fargo's alleged failure to disclose that Plaintiff would be financing (1) $637.99 of accrued interest owed on the Raveis Loan, and (2) a $53 recording fee.  (SAC ¶¶ 33-39, 70(a), (c).)  But Wells Fargo disclosed these amounts and, consequently, any interest resulting from the financing of these amounts does not constitute a "hidden fee."

### i.   Wells Fargo Disclosed That $637.99 In Accrued Interest Was Capitalized Into The Wells Fargo Loan.

Plaintiff's contention that Wells Fargo violated CUTPA by failing to disclose she was financing the payment of $637.99 of accrued interest on the Raveis Loan is without merit.  (*See* SAC ¶ 70(a)).  The documents provided to Plaintiff with the Mortgage Kit, including the Note,

Mortgage, TILA Disclosure Statement, and HUD-1, stated that the amount Plaintiff financed

under the Wells Fargo Loan totaled $126,416.05.  (*See* SAC ¶¶ 10, 21-23, 25-27, & Exs. B-C;

Mtn. Exs. 1-2.)  Plaintiff pleads in the Second Amended Complaint that the principal balance on

the Raveis Loan immediately after she made her last payment on March 1, 2012 was

$125,957.92 (SAC ¶ 15).  The difference between that number and the amount financed totals

$690.99, which consists of $637.99 in accrued interest and the $53.00 recording fee.  (*Id.* ¶¶ 34-

36.)  Thus, the Second Amended Complaint and its attachments actually establishes that the

$637.99 in accrued interest from the Raveis loan was disclosed.  (*Id.*, & Exs. B-C.)  To the extent

Plaintiff complains this accrued interest was not separately itemized, that claim fails because no

such legal requirement exists.

    Additionally, the $637.99 in accrued interest on the Raveis Loan (and any interest

resulting from that amount being capitalized into the Wells Fargo Loan) cannot be considered a

"hidden fee" because Plaintiff was aware of her obligation to pay that amount.  As Plaintiff

admits in the Second Amended Complaint, the Raveis Loan had a 6.375% interest rate, and

Plaintiff made her last payment on the Raveis Loan on March 1, 2012.  (SAC ¶¶ 14-15, 19, 34.)

Her Wells Fargo Loan did not fund until March 31, 2012, and thus the Raveis Loan accrued

interest from March 1 through March 30, 2012.  (*See* SAC Ex. D at 2 ("Your new mortgage loan

will fund as of the date on the Note").)  And in order to pay off and refinance the Raveis Loan

with the Wells Fargo Loan, all outstanding principal and interest on the Raveis Loan had to be

satisfied.  This is the intended result of any mortgage loan refinance.  *See, e.g.*, *In re Harding*,

274 B.R. 173, 175-76 (Bankr. D. Md. 2002) ("[C]ourts have relied on Black's Law Dictionary

for the definition of the term . . . .  Black's defines refinancing as '[a]n exchange of an old debt

for a new debt, as by negotiating a different interest rate or by ***repaying the existing loan with***

*money acquired from a new loan*.'") (emphasis added); *Morneault v. Morneault*, No. FA030732954, 2007 WL 1532774, at *1 (Conn. Super. Ct. May 15, 2007) ("In Merriam-Webster's Collegiate Dictionary 10th Edition the word refinance is defined as 'to renew or reorganize the financing or to finance something anew.'  Black's Law Dictionary 6th Edition the word refinance is defined as 'to finance again or anew; *to pay off existing debts with funds from new debt*; to extend the maturity date/or increase the amount of an existing debt; to arrange a new payment schedule; the discharge of an obligation with funds acquired through the creation of a new debt often at a different interest rate.'") (emphasis added).

Plaintiff's claim that Wells Fargo should have given her the option of paying the accrued interest upfront fails to state a plausible, cognizable claim because that $637.99 in accrued interest was due to Raveis, not to Wells Fargo.  (SAC ¶ 36-37).  Furthermore, the accrued interest would not have been due to Raveis until April 1, 2012, but the proceeds from the Wells Fargo Loan were used to pay off the Raveis Loan before that date.  Thus, Plaintiff is in reality seeking to hold Wells Fargo liable because it did not instruct her to *prepay* interest she owed *to Raveis*.  Plaintiff at all times had the option to prepay any interest she owed to Raveis, and there is no legal requirement for Wells Fargo to do so or to instruct her do so.  Thus, the CUTPA claim based on the $637.99 in accrued interest due to Raveis should be dismissed.

          **ii.**       **Wells Fargo Disclosed That The $53 Recording Fee Would Be Capitalized Into The Wells Fargo Loan.**

The CUTPA claim based on the $53 recording fee should also be dismissed.  Wells Fargo disclosed that a recording fee would be capitalized into the Wells Fargo Loan.  The "Frequently Asked Questions" document, which Plaintiff attached to and quotes in the SAC, expressly states: "Please note, a standard fee associated with the recording of the satisfaction of your existing

mortgage will be included in the total payoff of your existing loan."  (*See* SAC ¶¶ 28-29, Ex. E.)

Moreover, as discussed above the $53 recording fee was included in the $126,416.05 disclosed

"Amount Financed," and any resulting interest was included in the disclosed "Total of

Payments" on the TILA Disclosure Statement.  (*See* SAC ¶¶ 10, 21-23, 25-27, & Exs. B-C; Mtn.

Exs. 1-2.)  Therefore, Plaintiff's CUTPA claim based on alleged "hidden fees" fails as a matter

of law and should be dismissed.

> ### c. Plaintiff's CUTPA Claims Based On The Escrow Account Disclosures Fail As A Matter Of Law.

> #### i. Wells Fargo Did Not Misrepresent The Amount Of Plaintiff's Escrow Balance On The HUD-1.

The Second Amended Complaint fails to allege any conduct by Wells Fargo related to

her escrow account balance that is actionable under CUTPA.

The Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-2617 ("RESPA"), was

enacted to provide consumers "with greater and more timely information on the nature and costs

of the settlement process and [to] protect [them] from unnecessarily high settlement charges

caused by certain abusive practices," especially "kickbacks or referral fees that tend to increase

unnecessarily the costs of certain settlement services." 12 U.S.C. §§ 2601(a), (b)(2).  In

accordance with this objective, RESPA requires a lender of any "federally related mortgage

loan" to provide borrowers with a Uniform Housing and Urban Development Settlement

Statement ("HUD–1") that "conspicuously and clearly itemize[s] all charges imposed upon the

borrower."  *Id.* § 2603.[5]

---

[5] Notably, "these provisions of RESPA . . . do not themselves provide a private cause of action." *Gorbaty v. Wells Fargo Bank, N.A.*, No. 10-CV-3291 NGG SMG, 2012 WL 1372260, at *3 (E.D.N.Y. Apr. 18, 2012) (citing 12 U.S.C. § 2614).

Regulation X implements RESPA, and provides that"[t]he loan originator must transmit to the settlement agent all information necessary to complete the HUD-1," and "the settlement agent shall complete the HUD-1 . . . in accordance with the instructions set forth in appendix A to this part."  12 C.F.R. § 1024.8(a), (b).  As relevant here, Appendix A to Regulation X provides:

> Lines 1000–1007.  This series is used for amounts collected by the Lender from the Borrower and held in an account for the future payment of the obligations listed as they fall due. Include the time period (number of months) and the monthly assessment. In many jurisdictions this is referred to as an "escrow", "impound", or "trust" account. In addition to the property taxes and insurance listed, some Lenders may require reserves for flood insurance, condominium owners' association assessments, etc. The amount in line 1001 must be listed in the columns, and the itemizations in lines 1002 through 1007 must be listed outside the columns.

12 C.F.R. § Pt. 1024, App. A (effective Dec. 30, 2011).

Here, Plaintiff claims that Wells Fargo misrepresented the ending escrow balance on the Raveis Loan (the "Raveis Loan Escrow Balance") because line 1001 of the HUD-1 lists an amount of $2,560.65, but her ending escrow balance was only $2,118.35.  (SAC ¶¶ 40-41.)[6]  But the express language and regulatory purpose of line 1001 is *not* to indicate the borrower's ending escrow balance on her loan being refinanced, but rather is to disclose the amount that the refinancing lender, here Wells Fargo, requires to fund an escrow account for the payment of future obligations such as property taxes and insurance.  *See* 12 C.F.R. § Pt. 1024, App. A. Indeed, nowhere on Plaintiff's HUD-1 does it indicate that line 1001 represents the Raveis Loan Escrow Balance.  (*See id.* at Ex. C.)  Rather, line 1001 of the HUD-1 states that it reflects the "Initial deposit for your escrow account."  The figure listed in line 1001 is just the sum of the numbers itemized in the 1000-series of the HUD-1.  (*See* SAC, Ex C (12 months of

---

[6] Line 1001 of the HUD-1 lists an amount of $2,560.65.  (*See* SAC, Ex. C.)  It is unclear where Plaintiff obtained the $2,613.90 figure alleged in the SAC.  (*Id.* ¶ 41.)

homeowner's insurance of $639.00, plus 5 months of property taxes of $1974.90, less an

aggregate adjustment of $53.25, equals $2,560.65); *see also* 12 C.F.R. § Pt. 1024, App. A.)

Therefore, the CUTPA claim should be dismissed.

> **d.    Wells Fargo Disclosed At The Time Of Closing**
> **That Plaintiff's Monthly Payment Could**
> **Potentially Increase.**

According to Plaintiff, Wells Fargo's alleged misrepresentation of the escrow balance on

the HUD-1 resulted in Wells Fargo stating that Plaintiff's monthly payment beginning May 1,

2012 would be $1,052.87 including taxes and insurance, but that Wells Fargo Wells Fargo later

increased Plaintiff's monthly payment by $36.86 per month beginning with Plaintiff's June 1,

2012 payment.  (*Id.* ¶ 42.)  Plaintiff's loan documents demonstrate that this claim fails – Wells

Fargo disclosed the potential payment increase.

In connection with her loan closing, Plaintiff signed on March 13, 2012 the "Borrower

Acknowledgements, Agreements and Disclosures." (the "Borrower Agreement") (Exhibit 3.)

The Borrower Agreement stated:

> **9.    Escrow Balance Transfer**
> I/We understand that if I/we have an escrow account established on
> my/our current loan, an escrow account will be established on my/our new
> loan. I/We agree and understand the following:
> - **Initial Escrow Deposit** -- I/We agree that the Lender will
> transfer the balance in the escrow account on my/our existing loan
> and apply such amount as a credit towards the amount necessary to
> establish the escrow account on my/our new loan.

> **10.    Escrow Balance Transfer (Continued)**
>
> - **Escrow Account Statements** -- I/We understand that I/we will be
> provided with the following two escrow account statements after my/our
> new loan closes:  i) a Final Escrow Account Activity Statement describing
> the activity in the escrow account on my/our existing loan; and ii) an
> Initial Escrow Account Disclosure Statement for my/our new loan.  I/We
> understand that the Initial Escrow Account Disclosure Statement will
> include an analysis of the transfer of any positive or negative balances
> from my/our old loan as credits or debits towards the amount necessary to

> establish the escrow account on my/our new loan.  I/We understand that
> any deficiency in my new escrow account that may be shown on the Initial
> Escrow Account Disclosure Statement will be spread out over a 12 month
> period for easy payment, or, at my/our option, I/we may pay the
> deficiency amount in full as described in the statement.

Ex. 3 at ¶¶ 9-10 (bold in original).

As discussed above, line 1001 disclosed that the total amount required by Wells Fargo to establish the escrow account for Wells Fargo Loan was $2,560.65.  (SAC, Ex. C.)  The Borrower Agreement explained that the Raveis Loan Escrow Balance ($2,118.35) would be transferred and applied as a credit towards the required $2,560.65.  (Ex. 3 at ¶ 9.)  The difference between $2,560.65 and $2,118.35 equals $442.30.  As Plaintiff agreed when she signed the Borrower Agreement, this shortfall would be spread over 12 months for easy payment.  (Ex. 3 at ¶ 10.)  $442.30 divided by 12 equals $36.86, the exact amount that Plaintiff alleges her mortgage payment was increased beginning June 1, 2012.  (SAC ¶ 42.)

Moreover, Plaintiff agreed when she signed the Mortgage on March 13, 2012, to make payment for all escrow items with each monthly mortgage payment, and she further agreed that Wells Fargo could increase the required escrow amount as reasonably necessary:

> **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day
> Periodic Payments are due under the Note, until the Note is paid in full, a
> sum (the "Funds") to provide for payment of amounts due for: (a) taxes
> and assessments and other items which can attain priority over this
> Security Instrument as a lien or encumbrance on the Property; (b)
> leasehold payments or ground rents on the Property, if any; (c) premiums
> for any and all insurance required by Lender under Section 5; and (d)
> Mortgage Insurance premiums, if any, or any sums payable by Borrower
> to Lender in lieu of the payment of Mortgage Insurance premiums in
> accordance with the provisions of Section 10. These items are called
> "Escrow Items."
> . . .
> Lender may, at any time, collect and hold Funds in an amount (a)
> sufficient to permit Lender to apply the Funds at the time specified under
> RESPA, and (b) not to exceed the maximum amount a lender can require
> under RESPA. ***Lender shall estimate the amount of Funds due on the***

> *basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.*
>
> If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. *If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.*

(Ex. 2 at ¶ 3) (emphasis added.)[7]

Thus, Wells Fargo disclosed to Plaintiff the amount it required to establish the escrow account on the Wells Fargo Loan, the possibility that payments towards her escrow account could increase, and the nature and method in which those increases would occur. Plaintiff's CUTPA claim based on Wells Fargo's escrow account disclosures should be dismissed.

### 2.      Plaintiff's CUTPA Claim Is Preempted.

#### a.      Plaintiff's CUTPA Claim Is Preempted By TILA and RESPA.

"Congress . . . enacted the TILA in 1968 to 'assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit,' which would enhance 'economic stabilization . . . and the competition among the various financial institutions.'" *Sullivan v. Greenwood Credit Union*, 520 F.3d 70, 74 (1st Cir. 2008) (quoting 15 U.S.C. § 1601(a)). "The Act requires a creditor to disclose information relating to such things as finance charges, annual percentage rates of interest, and borrowers' rights, and it prescribes civil liability for any creditor

---

[7] RESPA and Regulation X provide that if a servicer has established an escrow account for a borrower, the servicer must submit to the borrower not less than once for each 12-month period, an escrow account analysis establishing the borrower's monthly escrow account payments for the next computation year. 12 U.S.C. §§ 2609(c)(2)(A) and (B) and 24 C.F.R. § 3500.17(c)(3). Regulation X also states that a servicer may conduct an escrow account analysis at any other time during the escrow computation year. 24 C.F.R. § 3500.17(f)(1)(ii).

who fails to do so[.]"  *Id*.  Congress found that "TILA's purpose is achieved by promoting uniformity in credit documents.  Atypical terms and forms can confuse borrowers, leading them to agree to credit products that they might have rejected had they understood them properly.  For that reason, TILA requires that many items of information be disclosed in specified ways."  *Hamm v. Ameriquest Mortgage Co*., 506 F.3d 525 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 1706 (2008); *see also In re Community Bank of North Virginia*, 418 F.3d 277, 303-04 (3d Cir. 2005).  Thus, state laws that are inconsistent with TILA's disclosure requirements are preempted.  *See* 15 U.S.C. § 1610(a)(1), 1666j(a); Reg. Z § 1026.28(a); Official Interpretations § 1026.28(a).  A state law is inconsistent if it requires a creditor to make disclosures or take actions that contradict the requirements of TILA.  *See* Official Interpretations § 1026.28(a).

RESPA also preempts inconsistent state laws.  *See* 12 U.S.C. § 2616 ("This chapter does not annul, alter, or affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any State with respect to settlement practices, except to the extent that those laws are inconsistent with any provision of this chapter, and then only to the extent of the inconsistency.")

Here, Wells Fargo does not contend that TILA and RESPA preempt all CUTPA claims.  But TILA preempts Plaintiff's CUTPA claims (or other state law claims) in the Second Amended Complaint to the extent they require disclosures that are inconsistent with TILA and RESPA.  Specifically, Plaintiff asserts Wells Fargo violated CUTPA by (a) misrepresenting the amount that was required to pay off the Raveis Loan; (b) misrepresenting the amount of Plaintiff's escrow balance on the HUD-1 provided to Plaintiff; and (c) misrepresenting to Plaintiff that the Wells Fargo Loan would not have any hidden fees when, in fact, the Wells Fargo Loan contains hidden fees. (SAC  ¶¶ 70-73.)  For the reasons discussed above, Plaintiff's

allegations that Wells Fargo should have (1) itemized the $637.99 in accrued interest she owed to Raveis; and (2) itemized the $53 recording fee, are inconsistent with TILA.  They are therefore preempted by TILA.  Similarly, Plaintiff's claim that Wells Fargo should have stated the Raveis Loan Escrow Balance on the HUD-1 is inconsistent with, and is thus preempted by, RESPA.  (*See supra*.)

### b.    Plaintiff's CUTPA Claim Is Preempted By The NBA.

"The National Bank Act . . . vests national banks such as Wells Fargo with authority to exercise 'all such incidental powers as shall be necessary to carry on the business of banking.'" *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 554-55 (9th Cir. 2010) (citing 12 U.S.C. § 24 (Seventh)).  "Real estate lending is expressly designated as part of the business of banking."  *Id.* (citing 12 U.S.C. § 371(a)).

As the agency charged with administering the Act, the Office of the Comptroller of the Currency ("OCC") has the primary responsibility for the surveillance of the "business of banking" authorized by the Act.  *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256, 115 S. Ct. 810, 130 L. Ed. 2d 740 (1995).  To carry out this responsibility, the OCC has the power to promulgate regulations and to use its rulemaking authority to define the "incidental powers" of national banks beyond those specifically enumerated in the statute.  See 12 U.S.C. § 93a (authorizing the OCC "to prescribe rules and regulations to carry out the responsibilities of the office"); *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 312 (2d Cir. 2005).  OCC regulations possess the same preemptive effect as the Act itself.  *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982).

"Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the

[Act]."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11, 127 S. Ct. 1559, 167 L. Ed. 2d 389 (2007) (citations omitted).  But state laws that "obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers" are preempted.  12 C.F.R. § 34.4(a); *see Watters*, 550 U.S. at 13, 127 S. Ct. 1559 ("Beyond genuine dispute, state law may not significantly burden a national bank's own exercise of its real estate lending power . . . ."); *Bank of Am. v. City and County of S.F.*, 309 F.3d 551, 561 (9th Cir. 2002) ("State attempts to control the conduct of national banks are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties.") (citation omitted).

The hundreds of years long "history of significant federal presence" in the regulation of national banks gives the NBA a preemptive force that other federal laws do not enjoy.  *City & Cnty. of San Francisco*, 309 F.3d at 559 (internal quotation and citation omitted).  The strong preemptive force of the NBA is necessary to prevent the "diverse and duplicative superintendence of national banks' engagement in the business of banking" that would result from the application of state laws with their individual "limitations and restrictions."  *Watters*, 550 U.S. at 13-14; *see also Robinson v. Bank of Am., N.A.*, 2011 WL 5870541, at *2, 6 (C.D. Cal. Nov. 22, 2011) ("The [National Bank Act] was enacted to establish a national banking system and to protect banks from intrusive state regulation."), *aff'd*, 525 F. App'x 580 (9th Cir. 2013).

For these reasons, the "usual presumption against federal preemption of state law is inapplicable to federal banking regulation."  *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1037 (9th Cir. 2008).  "The Supreme Court has interpreted 'grants of both enumerated and incidental powers to national banks as grants of authority not normally limited by, but rather

ordinarily preempting, contrary state law." *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 189 (2d

Cir. 2007) (quoting *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996)).  As

the Supreme Court explained:

> States are permitted to regulate the activities of national banks where
> doing so does not prevent or significantly interfere with the national
> bank's or the national bank regulator's exercise of its powers.  But when
> state prescriptions significantly impair the exercise of authority,
> enumerated or incidental under the NBA, the State's regulations must
> give way.

*Watters*, 550 U.S. at 12.

As applicable here, the NBA provides that national banks may: "make, arrange, purchase

or sell loans or extensions of credit secured by liens on interests in real estate." 12 U.S.C. § 371.

The OCC propounded 12 C.F.R. § 34.4 which regulates national banks, such as Wells Fargo.

The regulation provides:

> A national bank may make real estate loans under 12 U.S.C. 371 and
> § 34.3, without regard to state law limitations concerning:
>
> > (6) Escrow accounts, impound accounts, and similar accounts;
> > * * *
> > (9) Disclosure and advertising, including laws requiring specific
> > statements, information, or other content to be included in credit
> > application forms, credit solicitations, billing statements, credit
> > contracts, or other credit-related documents;
> >
> > (10) Processing, origination, servicing, sale or purchase of, or
> > investment or participation in mortgages."

12 C.F.R. § 34.4(a)(6), (9), (10).  "OCC regulations possess the same preemptive effect as the

Act itself."  *Martinez*, 598 F.3d at 555 (citing *de la Cuesta*, 458 U.S. at 153).

Plaintiffs' allegations concerning escrow accounts, disclosures, credit-related statements,

and loan origination fall squarely within the scope of subsections (6), (9) and (10) of § 34.4(a).

The underlying conduct that Plaintiff claims is unfair and/or deceptive and thus violates CUTPA

are Wells Fargo's disclosures and representations in originating her mortgage loan.  Specifically,

Plaintiff asserts that Wells Fargo violated CUTPA by allegedly (a) misrepresenting the amount

that was required to pay off the Raveis Loan; (b) misrepresenting the amount of Plaintiff's

escrow balance on the HUD-1 provided to Plaintiff; and (c) misrepresenting to Plaintiff that the

Wells Fargo Loan would not have any hidden fees when, in fact, the Wells Fargo Loan contains

hidden fees. (SAC  ¶¶ 70-73.)  At bottom, Plaintiff asserts her Connecticut CUTPA claim to

require that specific disclosures and representations be made with respect to a mortgage loan

originated in Connecticut by a national association.  Specifically, Plaintiff claims that Wells

Fargo should have (1) itemized the $637.99 in accrued interest she owed to Raveis; (2) itemized

the $53 recording fee; and (3) stated the Raveis Loan Escrow Balance on the HUD-1.  If

allowed, her CUTPA claim would frustrate the purposes of the NBA and the OCC's

implementing regulations.

Plaintiff's claims plainly go to the heart of the NBA's preemptive reach promulgated in

12 C.F.R. § 34.4(6), (9), (10).  Because the NBA provides that a national bank may make real

estate loans without regard to state laws concerning escrow accounts, disclosures and mortgage

origination, Plaintiff cannot use CUTPA to require Wells Fargo to make greater or different

disclosures than federal law requires.  *See, e.g.*, *Downey v. Wells Fargo Bank, N.A.*, No. CIV.A.

12-11340-DJC, 2014 WL 3510510, at *6 (D. Mass. July 11, 2014) (concluding that state statute

sought to regulate "disclosure[s]" regarding mortgages by federally chartered institutions, see 12

C.F.R. § 34.4, and therefore is preempted by the NBA"); *Bohnhoff v. Wells Fargo Bank, N.A.*,

853 F. Supp. 2d 849, 858 (D. Minn. 2012) (holding that state laws that regulate what a lender

may represent "in connection with a residential loan transaction" are preempted by the NBA);

*New Mexico v. Capital One Bank (USA) N.A.*, 980 F. Supp. 2d 1314, 1331 (D.N.M. 2013)

(concluding the NBA preempts the New Mexico Unfair Practices Act to the extent the state law claims are based upon alleged nondisclosures); *Wier v. Countrywide Bank, N.A.*, No. 10–CV–11468, 2011 WL 1256944, at *4 (E.D. Mich. Mar. 31, 2011) (holding the NBA preempts fraudulent misrepresentation claims based upon nondisclosures); *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 726 (9th Cir. 2012) (holding that the NBA preempts California unfair competition law claims because "[a] national bank may exercise its deposit-taking powers without regard to state law limitations concerning,' among other things, 'disclosure requirements"); *see also Lusnak v. Bank of Am.*, N.A., No. CV 14-1855-GHK AJWX, 2014 WL 6779131, at *9 (C.D. Cal. Oct. 29, 2014) (holding the NBA preempts state laws requiring national banks to pay borrowers interest on mortgage escrow accounts).

Plaintiff cannot circumvent NBA preemption by couching her allegations in state law claims of general applicability.  (*See* Motion at 19 (citing 12 C.F.R. § 34.4(b).)  "[S]tate laws of general application" are preempted whenever the "underlying conduct" being challenged implicates determinations that are left to the national bank pursuant to its federal powers. *Martinez*, 598 F.3d 549 at 556; *Gutierrez*, 704 F.3d at 722-28 (state law cannot be applied "in a way that interferes with [the] enumerated and incidental power[s] of national banks").

Indeed, Plaintiff seeks to apply CUTPA in a manner than is not "generally applicable." Rather, Plaintiff seeks to use CUTPA to regulate what a national bank must represent or disclose when originating a mortgage loan in Connecticut.  The conduct that Plaintiff seeks to regulate through her CUTPA claim directly implicates the items listed in 12 CFR § 34.4(a) -- namely, escrow accounts, disclosures and loan origination.  Federal law entitles Wells Fargo to "make real estate loans . . . without regard to [these] state law limitations."  *Id.*  Courts have consistently held that the NBA preempts state law unfair and deceptive act or practice ("UDAP") claims like

Plaintiff's.  *See, e.g.*, *Downey*, 2014 WL 3510510, at *6 (holding the NBA preempts disclosure claims under Massachusetts UDAP statute); *Bohnhoff*, 853 F. Supp. 2d at 858; *New Mexico*, 980 F. Supp. 2d at 1331 (holding nondisclosure and marketing practices under New Mexico UDAP statute are preempted); *Wier*, 2011 WL 1256944, at *4 ("Plaintiff's claims of fraudulent misrepresentation presuppose that certain information needed to be disclosed during the origination process.  As such, Plaintiff's claims of fraudulent misrepresentation are preempted by the NBA and must be dismissed"); *Martinez*, 598 F.3d at 554, 557 (plaintiffs' claim under California UDAP statute that the bank "engaged in 'fraudulent' practices by failing to disclose actual costs of its underwriting and tax services" was expressly preempted by the OCC regulation preempting state disclosure requirements in real estate transactions.").

WHEREFORE, Defendant Wells Fargo Bank, N.A. respectfully requests that the Court dismiss the Complaint in its entirety.

DATED:  September 30, 2015                    Respectfully submitted,

                                              SEYFARTH SHAW LLP


                                              By:  */s/ David M. Bizar*
                                                   David M. Bizar, Bar No. 566795
                                                   dbizar@seyfarth.com


                                              SEYFARTH SHAW LLP
                                              World Trade Center East
                                              Two Seaport Lane
                                              Suite 300
                                              Boston, MA  02210-2028
                                              Telephone:     (617) 946-4800
                                              Facsimile:     (617) 946-4801
                                              Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this 30th day of September 2015, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing on all parties of record.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

                         */s/   David M. Bizar*