UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALLYSON SMITH,

                         Plaintiff,

          – against –

WELLS FARGO BANK, N.A.,

                       Defendant.

Case: 3:15-cv-00089-SRU

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Respectfully submitted,

RANDALL S. NEWMAN, P.C.
37 Wall Street, Penthouse D
New York, NY  10005
(212) 797-3737

SEELEY & BERGLASS
121 Whitney Avenue, PH
New Haven, CT 06510
(203) 562-5888

*Attorneys for Plaintiff,*
*Allyson Smith*

Plaintiff, Allyson Smith ("Plaintiff"), respectfully submits this Memorandum of Law in Opposition to Defendant's Motion to dismiss Plaintiff's Second Amended Complaint[1] pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) (the "Motion").

## STANDARD FOR MOTION TO DISMISS

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, ***accepted as true***, to 'state a claim to relief that is plausible on its face.'" (emphasis added) *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly* at 556.  For the purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true.  *Id.* at 555.  Moreover, in TILA cases, "[w]here ... the sole issue is whether required disclosures have been made clearly and conspicuously, or whether additional disclosures confuse or mislead, the court may appropriately decide the plaintiff's claims as raising issues of law."  *Gambardella v. G. Fox & Co.*, 716 F.2d 104, 113 (2d Cir. 1983).

## PLAINTIFF'S ALLEGATIONS IN THE SAC

On June 16, 2008, Plaintiff purchased a residential property located at 456 Ruth Street, Bridgeport, Connecticut for the sum of $165,000.00 (the "Property").  (SAC ¶ 6).  From the time of its purchase to date, the Property has been Plaintiff's principal place of residence.  (SAC ¶ 7). In order to finance the purchase of the Property, Plaintiff entered into a Note with William Raveis Mortgage, LLC in the amount of $132,000.00 (the "Original Note").  (SAC ¶ 8).  In order to secure the Original Note, Plaintiff executed an Open-End Mortgage Deed with William Raveis

---

[1]     The Second Amended Complaint is hereinafter referred to as the "SAC".

Mortgage, LLC (the "Original Mortgage") (the "Original Note" and "Original Mortgage" are collectively referred to as the "Original Loan"). (SAC ¶ 9). The Original Note had a 30 year term with a fixed interest rate of 6.375% and required monthly principal and interest payments of $823.51 per month. (SAC ¶ 10). In addition to monthly $823.51 principal and interest payments, Plaintiff was required to make monthly payments of taxes and insurance into escrow. (SAC ¶ 11). After Plaintiff purchased the Property, Wells Fargo became the servicer of the Original Loan and it serviced the Original Loan thereafter until it was refinanced. (SAC ¶ 12).

After Wells Fargo became the servicer of the Original Loan, Plaintiff set up autodraft whereby the monthly payments on the Original Loan were automatically taken out of her bank account on the 1st day of each month. (SAC ¶ 13). Plaintiff timely made all the monthly payments on the Original Loan pursuant to the Original Note from August, 2008 until December, 2011. (SAC ¶ 14). The principal balance of the Original Note was $125,957.86 after Plaintiff made her March 1, 2012 monthly payment on the Original Loan. (SAC ¶ 15).

In February, 2012, Plaintiff contacted Wells Fargo to inquire about refinancing the Original Loan pursuant to the Home Affordable Refinance Program ("HARP"). (SAC ¶ 16). Sometime thereafter, Plaintiff applied to Wells Fargo to refinance the Original Loan pursuant to HARP. (SAC ¶ 17). On or about February 21, 2012 and February 27, 2012, employees of Wells Fargo left Plaintiff voicemail messages advising her that Wells Fargo would send the closing documents for the HARP refinance *after* Plaintiff made the March, 2012 payment on the Original Loan. (SAC ¶ 18). Plaintiff made her March, 2012 payment on the Original Loan on March 1, 2012 (through autodraft) and Wells Fargo posted Plaintiff's March, 2012 payment to the Original Loan on the same date. (SAC ¶ 19). On or about March 5, 2012, Lataska Troutman ("Ms. Troutman"), an employee of Wells Fargo, left a telephone message for Plaintiff telling her

3

to continue making payments on the Original Loan (including the April 1, 2012 payment) until Plaintiff was notified that her HARP loan had been approved for funding.  (SAC ¶ 20).

On or about March 9, 2012, Wells Fargo sent Plaintiff a "Close at Home® Mortgage Kit" (the "Mortgage Kit").  (SAC ¶ 21).  The Mortgage Kit included a Note from Plaintiff to Wells Fargo dated March 31, 2012 in the principal amount of $126,648.85 (the "Wells Fargo Note") and an Open-End Mortgage Deed from Plaintiff to Wells Fargo dated March 31, 2012 (the "Wells Fargo Mortgage") (the "Wells Fargo Note" and "Wells Fargo Mortgage" are collectively referred to as the "Wells Fargo Loan").  (SAC ¶¶ 22 and 23).  The Mortgage Kit included two (2) copies of a "Notice of Right to Cancel" ("NRC"), a Federal Truth-in-Lending Disclosure Statement dated March 8, 2012 ("TILA Disclosure Statement") and a HUD-1 Settlement Statement ("HUD-1") that identified the "Settlement Date" as March 31, 2012.  (SAC ¶¶ 24-26 and Exs. "A", "B" and "C" thereto).

The Mortgage Kit that Defendant Wells Fargo sent to Plaintiff included a two-page letter from Kristie Lewis, a representative of Wells Fargo (the "Lewis Letter"), which stated, "There are no closing costs or hidden fees with the Wells Fargo Three-Step Refinance *SYSTEM*."  (SAC ¶ 27 and Ex. "D" thereto).  The Mortgage Kit also included a one-page document titled "Frequently Asked Questions About the Wells Fargo Three-Step Refinance *SYSTEM*®" ("FAQs").  (SAC ¶ 28 and Ex. "E" thereto), as follows:

1.    The first question of the FAQs states:

> **Q:   How do I know that I'm receiving a no closing cost transaction?**

-     Here's how you will know:  Enclosed in this package are a "Truth in Lending Disclosure Statement", a "Good Faith Estimate" and a "HUD-1 Settlement Statement".  These are legally required documents designed to show you the real of your loan.

4

    -      The "Good Faith Estimate" and "HUD-1 Settlement Statement" are your further guarantee that there are no extra costs.  The fees listed on these documents are what you would normally pay out-of-pocket for a traditional refinance.  ***With this program, these costs will be paid by the Lender.***  You do not have to pay out any extra cash, unless your notary charges you a fee to notarize the closing documents.  Please note, a standard fee associated with the recording of the satisfaction of your existing mortgage will be included in the total payoff if your existing loan.

(emphasis added).  (SAC ¶ 29 and Ex. "E" thereto).  As discussed below, that statement was not true.

Plaintiff executed all of the documents included in the Mortgage Kit on March 13, 2012, and returned them to Defendant Wells Fargo several days thereafter.  (SAC ¶ 30).  On March 30, 2012, Ms. Troutman spoke with Plaintiff, advised Plaintiff that the Wells Fargo Loan had been approved for funding, and told Plaintiff to skip her April, 2012 payment on the Original Loan and cancel the autodraft feature on the Original Loan for the April 1, 2012 payment.  (SAC ¶ 31).

Despite the representation and assurance from Ms. Lewis on behalf of Defendant Wells Fargo in the Lewis Letter (Ex."D") that there were no "closing costs or hidden fees" on the Wells Fargo Loan, the Wells Fargo Loan does, in fact, contain hidden fees.  (SAC ¶ 32).  Line 104 of the HUD-1 (Ex. "C") shows a payoff amount of $126,648.85 to Wells Fargo[2] as a payoff on the Original Loan.  (SAC ¶ 33).  However, the actual principal balance due on the Original Loan after Plaintiff made the March 1, 2012, payment was only $125,957.92.  (SAC ¶ 34).  Thus, the payoff amount shown on Line 104 of the HUD-1 (Ex. "C") is $690.93 ***higher*** than the actual outstanding principal balance on the Original Loan.  (SAC ¶ 35).  Wells Fargo misrepresented the amount of the Original Mortgage payoff because Wells Fargo capitalized a $53 recording fee paid to the City of Bridgeport Town Clerk and $637.93 of interest in the Original Loan payoff

---

[2]       Wells Fargo was the servicer of the Original Loan that Raveis originated.

amount.  (SAC ¶ 36).  Neither of these capitalized amounts was disclosed to Plaintiff in the Mortgage Kit that Wells Fargo provided, and Wells Fargo did not give Plaintiff the option of paying those fees upfront instead of having those fees capitalized into the Wells Fargo Loan. (SAC ¶ 37).  By capitalizing the extra $690.93 Wells Fargo will collect additional interest in the amount of $495.91 from Plaintiff over the life of the Wells Fargo Loan.  (SAC ¶ 38).

Wells Fargo processed Plaintiff's March 1, 2012 payment on the Original Loan the same day it was received.  Therefore, Wells Fargo knew that the exact amount of Plaintiff's escrow balance on the Original Loan as of March 1, 2012 was $2,118.35.  (SAC ¶ 40).  Despite knowing the exact amount of Plaintiff's escrow balance on the Original Loan, on line 1001 of the HUD-1 that Wells Fargo  prepared and sent to Plaintiff on March 9, 2012, Wells Fargo misrepresented the balance of Plaintiff's escrow account to be $2,613.90, $495.55 more than the correct balance. (SAC ¶ 41 and Exhibit "C" thereto).  Based on Wells Fargo's misrepresentation of the escrow balance on the HUD-1,  it stated that Plaintiff's monthly payment beginning May 1, 2012 would be $1,052.87 including taxes and insurance.  Wells Fargo's misrepresentation regarding the amount of Plaintiff's escrow balance on the HUD-1, Wells Fargo artificially increased her monthly payment by $36.86 per month beginning with Plaintiff's June 1, 2012 payment on the Wells Fargo Loan.  (SAC ¶ 42).

## ARGUMENT

### *The Truth-in-Lending Act, Regulation Z and a Borrower's Right of Rescission*

Congress passed TILA in 1968 "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."  *See N.C. Freed Co. v. Board of Governors of Fed. Reserve Sys.*, 473 F.2d 1210, 1214 (2d Cir. 1973) *citing* 15 U.S.C. § 1601(a).  TILA was designed to

6

remedy "unscrupulous and predatory" lending practices.  *Id.*  TILA is a remedial act *and is to be construed liberally in favor of consumers*.  *Id.*

When Congress enacted TILA, it delegated broad authority for the implementation of TILA to the Federal Reserve Board ("FRB").   The FRB responded by promulgating a comprehensive set of rules known as Regulation Z,  12 C.F.R. § 226 *et seq.*   The Board of Governors of the Federal Reserve issued its interpretation of Regulation Z in its Official Staff Commentary.   However, the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111-203) ("Dodd-Frank Act") was signed by President Obama on July 21, 2010 as a response to the Great Recession.  The Dodd-Frank Act amended a number of consumer financial protection laws, including TILA.   In addition to several substantive amendments, the Dodd-Frank Act transferred rulemaking authority for TILA from the FRB to the Bureau of Consumer Financial Protection ("Bureau") effective July 21, 2011.  *See* sections 1061 and 1100A of the Dodd-Frank Act. Pursuant to the Dodd-Frank Act and TILA the Bureau published an interim final rule establishing a new Regulation Z, 12 C.F.R. § 1026, et. seq., implementing TILA effective December 30, 2011 ("Regulation Z").  As part of the Bureau's new Regulation Z, the Bureau also published Supplement I to Part 1026, the Bureau's Official Interpretations of Regulation Z ("Official Interpretations").

TILA imposes ***strict liability*** upon a creditor when required disclosures have not been made, regardless of the violation or the creditor's intent.  *Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 249-250 (3d Cir. 1980).   If a court finds a disclosure violation, no matter how technical, the court has no discretion on a creditor's liability.  *Grant v. Imperial Motors*, 539 F.2d 506, 510 (5th Cir. 1976).

***TILA's Extended Rescission Rights***

One of the most powerful features of TILA is the right of rescission it grants to a borrower in a consumer credit transaction and the fact that the right of rescission can be extended from 3 days until 3 years if a creditor does not provide the borrower with the disclosures required pursuant to TILA and Regulation Z.   If a creditor provides a borrower with all "material disclosures" **AND** two copies of a properly completed Notice of Right to Cancel, a borrower has three business days following the consummation of the transaction to rescind the transaction. *See* 15 U.S.C. § 1635(a)[3].  Regulation Z § 1026.23(a)(3)(i).

Regulation Z § 1026(b)(1), entitled "Notice of right to rescind," states:

In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind...  The notice shall be on a separate document that identifies the transaction and shall ***clearly and conspicuously*** disclose the following: ...  (v) ***The date the rescission period expires***.  (emphasis added).

If a creditor does not provide a borrower with two copies of a NRC or the NRC provided to the borrower does not clearly and conspicuously disclose the date the borrower's rescission

---

[3]       15 U.S.C. § 1635(a) states in relevant part that:

In the case of any consumer credit transaction ... in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title ..., whichever is later, by notifying the creditor, in accordance with regulations of the Bureau, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Bureau, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Bureau, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

period expires, the borrower's rescission right is extended from three days to three years.  *See* 15 U.S.C. § 1635(f)[4]; *See also* Regulation Z § 1026.23(a)(3)(i) (borrower may exercise right to rescind until midnight of third business day following consummation or delivery of right to cancel, whichever occurs last;  if NRC is not delivered to borrower, right to rescind shall expire 3 *years* after consummation).  As discussed below, Plaintiff alleges in her SAC that her right of rescission was extended from three days to three years because Wells Fargo did not provide her with two copies of a conforming NRC that clearly and conspicuously disclosed the date on which her rescission period expired.

## I.   THE NOTICE OF RIGHT TO CANCEL VIOLATED TILA AND REGULATION Z BECUASE IT DID NOT CLEARLY AND CONSPICUOSUSLY DISCLOSE THE DATE PLAINTIFF'S RESCISSION PERIOD EXPIRED

The principal dispute between the parties regarding whether the NRC violated TILA and Regulation Z is the date the Wells Fargo Loan was "consummated" because Plaintiff contends that the NRCs Wells Fargo provided in the Mortgage Kit failed to clearly and conspicuously disclose the date Plaintiff's rescission period expired.

### A.    *The NRCs Wells Fargo Provided to Plaintiff in the Mortgage Kit*

The NRCs Wells Fargo provided to Plaintiff in the Mortgage Kit stated that the "date of the transaction" (i.e., the date the Wells Fargo Loan was "consummated" ) was March 26, 2012 and that Plaintiff's rescission period expired on March 29, 2012.  (SAC Ex. "A").  The Plaintiff contends that the Wells Fargo Loan was "consummated" no earlier than March 30, 2012, and that her rescission period consequently expired no earlier than April 4, 2012.  (SAC ¶¶ 45-46). Defendant contends that the Wells Fargo Loan was "consummated" on March 13, 2012, when

---

[4]    15 U.S.C. § 1635(f) states in relevant part that a borrower's "right of rescission shall expire three years after the date of consummation of the transaction..."

Plaintiff executed the Wells Fargo Mortgage and Note, even though she did not deliver it to Wells Fargo at that time.  (Def's Mem. at 11-12).  Defendant argues that the NRC actually provided Plaintiff with more than three days to exercise her right to cancel the Wells Fargo Loan. (Def's Mem. at 13).

In most mortgage refinancing transactions, the "consummation" date would never be an issue because the vast majority of refinance transactions are consummated at a "round table" closing with both the borrower and lender present.  However, in this case, the entire transaction was done using Wells Fargo's "Close at Home® Mortgage Kit." In other words, Wells Fargo mailed a Mortgage Kit to Plaintiff, and Plaintiff then executed the documents in the Mortgage Kit and later mailed them back to Wells Fargo to be processed.  Thus, it is necessary to determine when the Wells Fargo Loan was "consummated."

### B.    *"Consummation" Pursuant to TILA and Regulation Z*

TILA does not define the term "consummation."  However, Regulation Z § 1026.2(a)(13) defines "consummation" to mean "the time that a consumer ***becomes contractually obligated on a credit transaction***."  (Emphasis added.)  Under the Official Interpretations of Regulation Z, § 1026.2(a)(13), state law governs when such a binding contractual obligation is created because Regulation Z does not make this determination itself.   Therefore, Connecticut contract law governs when the Wells Fargo Loan was "consummated."

### i.    **Plaintiff did not become contractually obligated on the Wells Fargo Loan until at least March 30, 2012**

It is settled law in Connecticut that "[t]o form a contract, generally there must be a bargain in which there is a manifestation of mutual assent to the exchange between two or more parties. . . . The manifestation of assent may be made wholly or partly by written or spoken

words or by other acts or by failure to act. . . . [The] agreement . . . requires a clear and definite promise." (Citations omitted; internal quotation marks omitted.) *Bartomeli v. Bartomeli,* 65 Conn.App. 408, 414, 783 A.2d 1050 (2001). "It is a fundamental principle of contract law that the existence and terms of a contract are to be determined from the intent of the parties. . . . The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were." (Internal quotation marks omitted.) *MD Drilling & Blasting, Inc. v. MLS Construction, LLC,* 93 Conn. App. 451, 454, 889 A.2d 850 (2006). *Auto Glass Express, Inc. v. Hanover Ins. Co.,* 293 Conn. 218, 225, 975 A.2d 1266 (2009).

Plaintiff contacted Wells Fargo in February, 2012 regarding refinancing the Original Loan pursuant to the HARP program and thereafter applied for the HARP program. (SAC ¶¶16-17). In February, 2012, Wells Fargo contacted Plaintiff and advised her that they would send her the Mortgage Kit after Plaintiff made the March, 2012 payment on the Original Loan. (SAC ¶ 18). Plaintiff made the March, 2012 payment on the Original Loan on March 1, 2012. (SAC ¶ 19).

On March 5, 2012, Ms. Troutman left a telephone message for Plaintiff ***telling her to continue making payments on the Original Loan (including the April 1, 2012) payment until Plaintiff was notified that her HARP loan had been approved for funding***. (SAC ¶ 20). On March 9, 2012, Wells Fargo sent the Mortgage Kit to Plaintiff. (SAC ¶ 21). Included in the Mortgage Kit was the Lewis Letter, which stated:

> We reserve the right to modify or eliminate this Home Affordable Refinance Program (HARP) at any time without notice to you. If the program is eliminated or you no longer qualify because of program modifications, you will be required to submit a new application for a different loan program.

(SAC Ex. "D" at 2).   Thus, on March 9, 2012, Wells Fargo reserved for itself the right to terminate the mortgage refinance transaction at any time.

Plaintiff executed the documents included in the Mortgage Kit on March 13, 2012, but did not send them to Wells Fargo until several days later.  (SAC ¶ 30).  Then on March 30, 2012, Ms. Troutman informed Plaintiff that the Wells Fargo Loan had been approved for funding and told Plaintiff not to make her regular monthly payment on the Original Loan due on April 1 and to cancel the autodraft feature for the April 1, 2012 payment on that loan.  (SAC ¶ 31).[5]

Under Connecticut law, Plaintiff could not possibly have been contractually obligated under the new Wells Fargo Loan until there was a manifestation of mutual assent and a clear and definite promise by both Plaintiff and Wells Fargo to be bound by the new loan.  *Bartomeli v. Bartomeli*, 65 Conn. App. 408, 414, 783 A.2d 1050 (2001).  As discussed above, on March 5, 2012, Wells Fargo contacted Plaintiff and advised her to continue making payments on the Original Loan until Plaintiff was notified that the Wells Fargo Loan had been approved for funding.  (SAC ¶ 20).

Additionally, in the Lewis Letter sent to Plaintiff as part of the Mortgage Kit, Wells Fargo expressly reserved the right to cancel the HARP program "***at any time***".  (SAC Ex. "D"). Therefore, Wells Fargo never made a clear and definite promise to fund the Wells Fargo Loan until at least March 30, 2012, when Wells Fargo contacted Plaintiff and told her that the Wells Fargo Loan was approved for funding and she was no longer liable to make payments on the Original Loan.   In fact, before Ms. Troutman told Plaintiff that the Wells Fargo Loan was approved for funding, Wells Fargo specifically instructed Plaintiff to continue making payments

---

[5]   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (for purposes of a motion to dismiss, Court must take all factual allegations in complaint as true).

on the Original Loan and Wells Fargo expressly reserved the right to cancel the Wells Fargo Loan "at any time". Therefore, it cannot be disputed that Wells Fargo made no clear and definite promise to fund the Wells Fargo Loan until at least March 30, 2012, the day that Ms. Troutman contacted Plaintiff and advised her that the Wells Fargo Loan had been approved for funding and that she was no long liable to make payments on the Original Loan.

Moreover, Plaintiff could not have been contractually obligated under the Wells Fargo Loan until both Plaintiff and Wells Fargo intended to be bound by the Wells Fargo Loan. *MD Drilling & Blasting, Inc. v. MLS Construction, LLC,* 93 Conn. App. 451, 454, 889 A.2d 850 (2006). *Auto Glass Express, Inc. v. Hanover Ins. Co.,* 293 Conn. 218, 225, 975 A.2d 1266 (2009). Because the transaction with Wells Fargo was a refinance of the Original Loan, Plaintiff could not have intended to be contractually obligated on both the Original Loan and the Wells Fargo Loan when she executed the documents in the Mortgage Kit. Furthermore, Wells Fargo could not have intended to be contractually obligated to fund the Wells Fargo Loan as Wells Fargo contacted Plaintiff on March 5, 2012 and advised her to continue making payments on the Original Loan until Plaintiff was notified that the Wells Fargo Loan had been approved for funding. (SAC ¶ 20). And, Wells Fargo could not have intended to be contractually obligated to fund the Wells Fargo Loan because they expressly reserved the right to cancel the HARP program "*at any time*". (SAC Ex. "D"). Wells Fargo did not intend to be contractually obligated to fund the Wells Fargo Loan until March 30, 2012, the day that Ms. Troutman contacted Plaintiff and advised her that the Wells Fargo Loan had been approved for funding and that she was no long liable to make payments on the Original Loan. At that point, Wells Fargo intended to be contractually obligated to fund the Wells Fargo Loan and Plaintiff intended to be contractually obligated to pay the Wells Fargo Loan because at that point Plaintiff knew that she

13

was no longer liable to make payments on the Original Loan.  Therefore, for the reasons discussed above, pursuant to Connecticut law, Plaintiff did not become contractually obligated on the Wells Fargo Loan until at least March 30, 2012 and pursuant to TILA and Regulation Z, the Wells Fargo Loan was not "consummated" until March 30, 2012.

### ii.    The Wells Fargo Loan Could Not Have Been Consummated on March 13, 2012

In its Motion, Wells Fargo argues that "Plaintiff entered into the Wells Fargo Loan on March 13, 2012" and asserts that the "Wells Fargo Loan was consummated on March 13, 2012, when Plaintiff signed the Note and Mortgage."  (Def. Mem. at 11-12).  As a matter of  black-letter contract law, Defendant's argument that March 13, 2012 was the date on which the Wells Fargo Loan was consummated cannot possibly be correct.  There is little doubt that  on March 13, 2012, there was no manifestation of mutual assent and a clear and definite promise by both Plaintiff and Wells Fargo to be bound by the Wells Fargo Loan as Plaintiff did not even return the executed documents to Wells Fargo until several days later.  Under Defendant's theory of "consummation", Plaintiff would have been contractually obligated under the Wells Fargo Loan on March 13, 2012 even if Plaintiff had never returned the executed documents to Wells Fargo. Obviously, Plaintiff could not have brought an action against Wells Fargo to require them to fund the Wells Fargo Loan if she had never returned the documents.

Citing *Murphy v. Empire of America, FSA*, 746 F.2d 931 (2d Cir. 1984), Defendants argue that a "transaction is consummated when the ***lender and borrower*** sign a contract obligating them, respectively, to lend and to borrow the funds."  (emphasis added).  However, the issue in *Murphy* was whether a consumer's acceptance of a commitment letter that had been ***executed by both the lender and the borrower***, constituted a binding contract.  Here, Wells Fargo did ***not*** have any obligation to fund the Wells Fargo Loan until at least March 30, 2012,

14

the day that Ms. Troutman contacted Plaintiff and advised her that the Wells Fargo Loan had been approved for funding and that she was no longer liable to make payments on the Original Loan.  Again, until Wells Fargo contacted Plaintiff on March 30, 2012,  Wells Fargo expressly reserved the right ***not*** to lend any funds to Plaintiff if Wells Fargo decided to eliminate the HARP program before it funded the Wells Fargo Loan.

Defendant also relies on *Bank of New York v. Conway*, 50 Conn. Supp. 189, 199-200, 916 A.2d 130, 138 (Conn. Super. Ct. 2006) for its argument that a loan is consummated as soon as the borrower has signed a contract binding him to borrow and repay funds.  However, in *Conway*, a round table closing took place on March 22, 2000, and the defendant signed the promissory note and delivered it to the lender at the closing.  Therefore, in *Conway*, the borrower and lender simultaneously made mutual promises and intended to be bound by the promissory note at the closing.  Therefore, *Conway* is completely inapplicable to the present action.

Defendant also argues that Plaintiff could not have become contractually obligated on the Wells Fargo Loan on March 30, 2012 because of Ms. Troutman's telephone call because all contracts concerning interest in real property must be in writing.  (Def's Mem. at 13).  Defendant relies on Connecticut's statute of frauds, General Statutes § 52-550 and *L&R Realty v. Connecticut Nat. Bank*, 53 Conn. App. 524 (1999), to support its argument.  However, Defendant's legal support is completely irrelevant to this matter.

General Statutes § 52-550(a)(4) states that "No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . upon any agreement for the sale of real property or any interest in or concerning real property."  Connecticut's statute of frauds is completely inapplicable to this matter.  The Plaintiff is ***not*** suing the Defendant based

15

upon an agreement for the sale of a real property interest, such as an action to enforce the Wells Fargo Loan.  By its own terms, Connecticut's statute of frauds does not apply.

> **C.**     ***The Notice of Right to Cancel did not give Plaintiff clear and conspicuous notice of the date her rescission period expired***

It is well-settled in this District that TILA requires at a minimum "clear and conspicuous" notice of the date a consumer's rescission period expires.  *See Aubin v. Residential Funding Co., LLC*, 565 F.Supp. 2d 392, 396 (D. Conn. 2008).  "Although there is some disagreement as to what constitutes 'clear and conspicuous' notice, courts generally agree it is measured by an objective, rather than a subjective, test; thus, the question courts ask is whether the average consumer would find the notice clear or confusing."  *See, e.g, Handy v. Anchor Mortgage Corp.,* 464 F.3d 760, 764 (7th Cir. 2006); *Palmer v. Champion Mortgage,* 465 F.3d 24, 28 (1st Cir. 2006); *Wiggins v. AVCO Fin. Servs.,* 62 F. Supp. 2d 90, 94 (D.D.C. 1999) ("All courts are agreed that alleged violations of TILA are subject to an objective standard of review.").  *See also* Regulation Z § 1026(b)(1).

> **i.**     **The NRCs Wells Fargo provided to Plaintiff stated the wrong "date of transaction" and the wrong date that Plaintiff's rescission period expired**

The NRCs Wells Fargo provided Plaintiff did not provide the correct date that Plaintiff's rescission period expired.  The NRC states that the "date of the transaction" is March 26, 2012 and that the Plaintiff's rescission period expired on March 29, 2012.  (SAC Ex. "A").  However, as explained above, the "consummation" date of the Wells Fargo Loan was at the earliest March 30, 2012 so Plaintiff's right to rescind did not expire until at least April 4, 2012, six days after the date stated on the NRCs provided to Plaintiff.  Additionally, the NRCs hardly provided Plaintiff with "clear and conspicuous" notice of the date her rescission period expired as the

16

TILA Disclosure Statement is dated March 8, 2012 (SAC Ex. "B"), the HUD-1 identifies the "Settlement Date" as March 31, 2012 (SAC Ex. "C"), and the Wells Fargo Mortgage and Wells Fargo Note are both dated March 31, 2012 (Def's Mem. Exs. 1 and 2). The March 26, 2012 "date of the transaction" listed on the NRCs has no relation to *any date* in the transaction.

Not only would an average consumer find the NRC Wells Fargo provided to Plaintiff confusing, it is hard to imagine that *any* consumer could possibly calculate the date their rescission period expired based on the fact that virtually every document Wells Fargo provided to Plaintiff was dated differently and after litigating this matter for eight months, even counsel for the Parties cannot agree on the date the Wells Fargo Loan was consummated.

### D. *Plaintiff timely sent Wells Fargo a request to rescind the Wells Fargo Loan*

If a creditor does not provide a borrower with two copies of a NRC or the NRC provided to a borrower fails to clearly and conspicuously disclose the date the borrower's rescission period expires, a borrower's rescission right is extended from three days to three years. *See* 15 U.S.C. § 1635(f).[6] Under Regulation Z § 1026.23(a)(3)(i), a borrower may exercise her the right to rescind until midnight of the third business day following consummation or delivery of the right to cancel notice, whichever occurs last. However, if the required notice is *not* delivered to the borrower, her right to rescind does not expire until three *years* after consummation. *Id*. As discussed above, the NRCs that Wells Fargo provided to Plaintiff failed to clearly and conspicuously disclose the date when Plaintiff's rescission period expired. Therefore, Plaintiff had *three years* to rescind the Wells Fargo Loan.

---

[6]     15 U.S.C. § 1635(f) states in relevant part that a borrower's "right of rescission shall expire three years after the date of consummation of the transaction..."

On October 21, 2014, Plaintiff notified Wells Fargo that she elected to rescind the Wells Fargo Loan.  (SAC ¶ 47 and Ex. "F" thereto).  Plaintiff's rescission request was sent to Wells Fargo well within the three-year period after consummation of the Wells Fargo Loan, Plaintiff's request to rescind the Wells Fargo Loan was timely pursuant to TILA and Regulation Z.[7]

## II.   COUNT II OF THE SAC STATES A CLAIM FOR MONETARY DAMAGES

15 U.S.C. § 1640(e) provides:

> Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year *from the date of the occurrence of the violation*. [Emphasis added]

The Plaintiff's Second Cause of Action is a claim against Wells Fargo for failing to comply with her October 21, 2014 rescission notice.  (SAC ¶¶ 64-66).  It is well settled that a lender's failure to comply with a rescission notice is a separate and independent violation of TILA, giving rise to a separate claim from damages.  *See Canty v. Equicredit Corp.*, 2003 WL 21243268 (E.D.Pa. 2003).  Because the Plaintiff has properly stated a cause of action based on Defendant's failure to provide Plaintiff with "clear and conspicuous" notice of the date when Plaintiff's rescission period expired, Plaintiff is entitled to maintain an independent cause of action against Defendant for refusal to honor Plaintiff's timely rescission request.  Therefore, Defendant's Motion to Dismiss Plaintiff's Second Cause of Action must be denied.

## III.   COUNT III OF THE SAC STATES A CLAIM UNDER CUTPA

CUTPA § 42-110(b) provides that "[n]o personal shall engage un unfair methods of competition and unfair *or* deceptive acts or practices in the conduct of any trade or commerce." (emphasis added).  As the Supreme Court of Connecticut stated in *Ramirez v. Health Net of the*

---

[7]   As alleged in paragraph 49 of the SAC, Plaintiff is "ready, will and financially able to tender the proceeds of the Wells Fargo Loan to Wells Fargo after the Court determines that mount of Plaintiff's tender obligation."

*Northeast, Inc.*, 285 Conn. 1, 19 (2008):

> It is well settled that in determining whether a [unfair] practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. Thus a violation of CUTPA may be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public policy. (internal citations and quotation marks omitted).

CUTPA provides a private cause of action to any person who suffers any ascertainable loss of money or unfair act, or deceptive practice. CUPTA § 42-110g(a); *See also Stevenson Lumber Co.-Suffield, Inc v. Chase Associates, Inc.*, 284 Conn. 205, 213-214 (2007). To state a claim under CUTPA for a deceptive practice, the plaintiff must plead sufficient facts to support three elements: "First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material, that is, likely to affect consumer decisions or conduct." *Caldor, Inc. v. Heslin*, 215 Conn. 590, 597 (1990), *cert. denied*, 498 U.S. 1088 (1991) (internal quotation marks omitted.). An intent to deceive, to mislead, or to defraud is not required to state a claim under CUTPA. *Muniz v. Kravis*, 59 Conn.App. 704, 713 (2000).

### A.    *Plaintiff's allegations of CUTPA Violations*

In the Lewis Letter sent to Plaintiff in the Mortgage Kit, Wells Fargo stated, "There are no closing costs or hidden fees with the Wells Fargo Three-Step Refinance *SYSTEM*." (SAC ¶

27 and Ex. "D" thereto).  Furthermore, in the "Frequently Asked Questions About the Wells Fargo Three-Step Refinance *SYSTEM*®," Wells Fargo answered the question "How do I know that I'm receiving a not closing cost transaction?" that "The 'Good Faith Estimate' and 'HUD-1 Settlement Statement' are your further guarantee that there are no extra costs."  (SAC ¶ 28-29 and Ex. "E" thereto).  Plaintiff alleges that these statements regarding no closing costs or hidden extra costs were false.

**i.**   **Wells Fargo Misrepresented the amount of the Original Loan Payoff on the HUD-1 Settlement Statement**

First, Plaintiff alleges that Wells Fargo misrepresented the amount of the Original Loan payoff on the HUD-1 Settlement Statement.  As detailed in the SAC, the principal balance due on the Original Loan after Plaintiff made her March 1, 2012 payment was $125,957.92.  However, Wells Fargo misrepresented the amount of Original Loan payoff on the HUD-1 as it showed that the Original Loan payoff was $126,648.85.  Despite the fact that Wells Fargo made several representations regarding the fact that the Wells Fargo Loan contained no hidden fees, Wells Fargo misrepresented the Original Loan payoff on the HUD-1 and inflated the payoff amount by capitalizing $690.99.  As a result, Plaintiff will pay additional interest in the amount off $495.91 over the life of the Wells Fargo Loan, which constitutes a hidden fee and a misrepresentation by Wells Fargo that the Wells Fargo Loan did not contain any hidden fees.  Nothing in the Mortgage Kit Wells Fargo provided to Plaintiff disclosed that Wells Fargo had capitalized $690.99 into the Wells Fargo Loan.  (SAC ¶ 38).

Defendant responds to Plaintiff's argument that Wells Fargo misrepresented the payoff amount of the Original Loan by arguing that it did not misrepresent the payoff of the Original Loan because Plaintiff's counsel (who is an attorney/CPA) was able calculate the amount of

20

accrued interest that Wells Fargo capitalized into the Wells Fargo Loan and make allegations regarding the misrepresentations in the SAC. That is pure nonsense. No reasonable consumer (including Plaintiff) would be able to calculate the amount of interest that Wells Fargo capitalized into the Wells Fargo Loan and Wells Fargo has provided absolutely no explanation as to why it failed to disclose the interest that it capitalized into the Wells Fargo Loan.

Plaintiff has alleged a misleading representation and omission in that Wells Fargo failed to disclose that it capitalized $637.99 in interest into the Wells Fargo Loan. (SAC ¶¶32-39, 70). Plaintiff alleges that Wells Fargo's representation and omission were material to Plaintiff's decision to enter into the Wells Fargo Loan. (SAC ¶ 71). And, Plaintiff alleges that she will suffer an ascertainable loss of money as a result of Wells Fargo's failure to disclose the capitalized interest. (SAC ¶¶ 38, 72).

### ii. Wells Fargo Misrepresented the amount of her escrow balance on the HUD-1 Settlement Statement

Wells Fargo processed Plaintiff's March 1, 2012, payment on the same day it was received. Therefore, Wells Fargo knew that the exact amount of Plaintiff's escrow balance on the Original Loan was $2,118.35 as of March 1, 2012. (SAC ¶ 40). Even though Wells Fargo knew the exact amount of Plaintiff's escrow balance on March 1, 2012, it misrepresented that the balance of her escrow account was $2,613.90 in the HUD-1 it prepared and sent to Plaintiff on March 9, 2012.[8] (SAC ¶ 40 and Ex. "C").

Line 1000 of the HUD-1 states **"Reserves Deposited with Lender"**. Line 1001 of the

---

[8]     Defendant contends that "it is unclear where Plaintiff obtained the $2,613.90 figure alleged in the SAC." (Def's Mem. fn. 6). That Amount is equal to the amount shown on line 1002 of the HUD-1 for Homeowner's Insurance ($639) plus the amount shown on line 1004 of the HUD-1 for City Property Taxes ($1,974.90). Thus, $639 + $1,974.90 = $2,613.90.

HUD-1 states "Initial deposit for your escrow account" and lists the amount as $2,560.65. (SAC Ex. "C"). As Plaintiff alleges in the SAC, Wells Fargo knew the exact amount of Plaintiff's escrow balance was $2,118.35 at the time it prepared the HUD-1 dated March 8, 2012 and misrepresented the balance of Plaintiff's escrow account to be $2,613.30. (SAC ¶¶ 40-41 and Ex. "C" thereto). As a result of Wells Fargo's misrepresentation regarding the amount of Plaintiff's escrow balance, Wells Fargo increased Plaintiff's monthly payment by $36.86 per month beginning with Plaintiff's June 1, 2012 payment on the Wells Fargo Loan. (SAC ¶ 42).

Despite Defendant's contentions that the amount on the HUD-1 is merely the amount Wells Fargo required to fund the Wells Fargo escrow account, the HUD-1 clearly identifies the amounts as the "**Reserves Deposited with Lender**". Clearly, a reasonable borrower would assume that $639 was deposited with Wells Fargo for Homeowner's Insurance and $1,974.90 was deposited with Wells Fargo for City Property Taxes.

Plaintiff alleges a misleading representation regarding Wells Fargo's preparation of the HUD-1. (SAC ¶¶ 40-42, 70). Plaintiff has also alleged that Wells Fargo's representation was material to Plaintiff's decision to enter into the Wells Fargo Loan. (SAC ¶ 71). And, Plaintiff alleges that she will suffer an ascertainable loss of money as a result of Wells Fargo's misrepresentation of the amount that was deposited into her Wells Fargo escrow account. (SAC ¶¶ 42, 72). Wells Fargo has not even attempted to explain why it misrepresented the amount of Plaintiff's escrow account on the HUD-1 it prepared even though it knew the *exact* amount of Plaintiff's escrow account balance when it prepared the HUD-1.

###### B.    *Plaintiff's CUTPA Claims are not Preempted by the NBA*

In its Motion, Defendant argues that that National Bank Act, 12 U.S.C. § 21 *et seq*. (the "NBA") preempts Plaintiff's CUTPA claims. (Def's Mem. at 25). The U.S. Supreme Court has

said that "Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA.  For example . . . contracts made by national banks are governed and construed by State laws."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) (internal quotation marks and citations omitted).  Causes of action pursuant to consumer protection statutes have repeatedly been found by federal courts not to be preempted by the NBA.  *See Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 552 (S.D.N.Y. 2014) (New York General Business Law § 349 claim is not preempted by the NBA); *Baldanzi v. WFC Holdings Corp.*, 2008 U.S. Dist. LEXIS 95727 at *2 (S.D.N.Y. Nov. 14, 2008) (New York General Business Law § 349 claim is not preempted by the NBA).

In *Guitierrez v. Wells Fargo Bank*, 704 F.3d 712, 726 (9th Cir. 2012), a case cited by the Defendant for the proposition that Plaintiff's CUTPA claim is preempted by the NBA, the Court held that claims under California's Unfair Competition Laws regarding misleading statements made by Wells Fargo ***were not preempted*** by the NBA because California's Unfair Competition Laws do "not conflict with federal law, frustrate the purposes of the National Banking Act, or impair the efficiency of national banks to discharge their duties..."  The Defendant correctly points out that the Office of the Comptroller of the Currency ("OCC") has the authority to make regulations pursuant to the NBA.  However, as the Court in *Guiterrez* stated:

> Wells Fargo's position that [California's Unfair Competition Laws are preempted by the NBA]  ... is conclusively undercut by the OCC itself, which, far from concluding that the Unfair Competition Law is expressly preempted under its regulations, 'has specifically cited [California's Unfair Competition Laws] in an advisory letter cautioning banks that they may be subject to such laws the prohibit unfair or deceptive acts or practices.  The advisory letter warns that the 'consequences of engaging in practices that may be unfair or deceptive under federal or state law can include litigation, enforcement actions, monetary

judgments, and harm to the institution's reputation.'  The OCC recognizes that state laws that withstand preemption 'typically do not regulate the manner or content of the business of banking authorized for national banks, but rather establish the legal infrastructure that makes practicable the conduct of that business.  By prohibiting fraudulent business practices, the Unfair Competition Law does exactly that -- it establishes a legal infrastructure.  (internal citations omitted).

*Id.* at 726-727.

Given the vast amount of case law that contradicts Defendant's argument that Plaintiff's CUTPA claims are preempted by the NBA, Defendant's motion to dismiss the CUTPA claims must be denied.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint.

Dated: New York, New York
        November 20, 2015

                                      Respectfully submitted,

                                      RANDALL S. NEWMAN, P.C.

                          By:    /s/ Randall S. Newman
                                 Randall S. Newman, Esq.
                                 37 Wall St., PH D
                                 New York, New York  10005
                                 (212) 797-3737
                                 rsn@randallnewman.net
                                 Federal Bar No. phv03985

                                 SEELEY & BERGLASS
                                 Steven Berglass, Esq.
                                 121 Whitney Avenue, PH
                                 New Haven, CT 06510
                                 (203) 562-5888
                                 Federal Bar No. ct06030

                                 *Attorneys for Plaintiff,*
                                 *Allyson Smith*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of November, 2015 a copy of the foregoing Memorandum in Opposition to Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Randall S. Newman*
Randall S. Newman