## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ALLYSON SMITH,
     Plaintiff,

     v.

WELLS FARGO BANK, N.A.,
     Defendant.

No. 3:15-cv-89 (SRU)

## RULING ON DEFENDANT'S MOTION TO DISMISS

This case arises out of a mortgage refinancing agreement between Allyson Smith and Wells Fargo, N.A.  Smith seeks to enforce her right to rescission under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, and receive damages for Wells Fargo's failure to honor her request for rescission.  Smith also seeks damages under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq.*, alleging that Wells Fargo engaged in deceptive acts or practices in connection with the refinancing agreement.

Wells Fargo moves to dismiss Smith's second amended complaint ("SAC") in its entirety.  It argues that Smith's TILA claims should be dismissed because she was given adequate notice of her right to rescind and failed to exercise that right within the allotted three-day period.  Wells Fargo asserts that Smith's CUTPA claims should be dismissed because Smith has failed to adequately allege a deceptive act or practice.  Furthermore, to the extent that CUTPA requires Wells Fargo to provide additional disclosures, such a requirement would be preempted by TILA, the National Banking Act ("NBA"), and the Real Estate Settlement Practices Act ("RESPA").

For the following reasons, I grant Wells Fargo's motion to dismiss.  Smith has failed to plead facts indicating that she exercised her right to rescission before that right had expired.

Furthermore, Smith cannot make out a CUTPA claim because she fails to allege a deceptive act

or practice.  To the extent that CUTPA would require disclosures in excess of those required by

TILA, NBA and RESPA, those claims are preempted.

## I.     Background

Allyson Smith filed the instant action against Wells Fargo Bank, N.A., on January 21,

2015.  Counts I and II allege violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601,

*et seq.*  Count III alleges a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"),

Conn. Gen. Stat. § 42-110a, *et seq.*  Through those claims, Smith seeks to enforce her right to

rescind the consumer credit transaction, void the security interest in her home, and recover

statutory damages, actual damages, punitive damages, and reasonable attorneys' fees and costs.

Smith's claims arise out of a refinancing agreement between her and Wells Fargo.

Beginning in February 2012, Smith and Wells Fargo conversed about Smith's eligibility to

refinance her current mortgage ("Raveis Loan") through the Home Affordable Refinance

Program ("HARP").  As a result of those discussions, Wells Fargo sent Smith a "Close at

Home® Mortgage Kit" ("Mortgage Kit") on March 9, 2012.

The Mortgage Kit included: (1) a Note from Smith to Wells Fargo, dated March 31,

2012, in the principal amount of $126,648.85; (2) an Open-End Mortgage Deed from Smith to

Wells Fargo, dated March 31, 2012; (3) two copies of a "Notice of Right to Cancel," providing

that Smith had three business days from the date of the transaction or until March 29, 2012,

whichever occurred later, to rescind the refinancing agreement; (4) a Federal Truth-in-Lending

Disclosure Statement dated March 8, 2012; (5) a HUD-1 Settlement Statement ("HUD-1"),

which identified the "Settlement Date" as March 31, 2012, and contained the amount of escrow

balance that the refinanced loan would require; (6) a two-page letter from Kristie Lewis, a

representative of Wells Fargo ("Lewis Letter"), which stated that "[t]here are no closing costs or hidden fees with the Wells Fargo Three-Step Refinance *SYSTEM*."; and (7) a one-page document titled "Frequently Asked Questions About the Wells Fargo Three-Step Refinance *SYSTEM®*," which provided that a "standard fee associated with the recording of the satisfaction of your existing mortgage will be included in the total payoff of your existing loan."

Smith alleges that she executed all of the documents in the Mortgage Kit on March 13, 2012, and returned them to Wells Fargo soon thereafter.  On March 30, 2012, Wells Fargo notified Smith that she had been approved for the loan and that Smith could skip her interest payment on the Raveis Loan, due April 1, 2012.

Smith alleges that the principal balance on the Raveis Loan as of March 30, 2012, was $125,957.92.  The amount that Wells Fargo financed was $126,648.85, which represented the principal balance on the Raveis loan and an additional $690.93.  Smith alleges that the $690.93 amount represents $53 for a recording fee and $637.93 for the April 1, 2012, interest payment on the Raveis Loan.

Smith alleges that the escrow balance on the Raveis Loan was $2,118.35.  The new escrow balance on the refinanced loan, Smith contends, was $2,613.90.

On October 21, 2014, Smith notified Wells Fargo of her desire to rescind the refinanced loan.  A week later, Wells Fargo notified Smith that it would not honor her request.  Shortly after receiving the notice, Smith filed the instant action.

## II.    Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof."  *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities,*

*Inc.*, 748 F.2d 774, 779 (2d Cir. 1984).  Thus, when deciding a motion to dismiss, the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted).  Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely."  *Id.* at 556 (quotation marks omitted).

## III.    Discussion

Plaintiff Allyson Smith brings three claims against defendant Wells Fargo.  Count I of the second amended complaint ("SAC") alleges that Wells Fargo should be forced to comply with her October 21, 2014, notice of rescission and terminate the loan agreement.  She argues that her right to rescission was extended from three days to three years because Wells Fargo failed to provide adequate notice of her right to rescind as provided by 15 U.S.C. § 1635 (TILA).  Count II alleges that, under 15 U.S.C. § 1640 and § 1635, Wells Fargo is liable for damages incurred by

Smith as a result of the failure to honor her timely request to rescind.  The parties agree that, if

Smith was within her right to rescind on October 21, 2014, Count II is uncontested.  Finally,

Count III alleges that, notwithstanding her right to rescind, Wells Fargo violated the Connecticut

Unfair Trade Practices Act ("CUTPA") by promising "no closing costs or hidden fees" when it

had in fact included certain non-itemized costs.  As part of Smith's CUTPA claim, she also

alleges that Wells Fargo misrepresented the amount of escrow that she was required to pay as

part of the refinancing agreement.  I will address each claim in turn.

A. Claim I: Enforcement of Rescission

The Truth in Lending Act ("TILA") was passed to ensure a "meaningful disclosure of

credit terms . . . and to protect the consumer against inaccurate and unfair credit billing and credit

card practices."  *Lahoud v. Countrywide Bank FSB*, No. 3:07-cv-01616 (DJS), 2012 WL

1067391, at *7 (D. Conn. Mar. 30, 2012) (quoting 15 U.S.C. § 1601(a)).  As a mechanism of

protecting consumers, TILA and the regulations implemented by the Federal Reserve Board give

consumers three business days to rescind a loan that uses their principal dwelling as security.

*Id.*; 15 U.S.C. § 1635(a); 12 C.F.R. § 226 ("Regulation Z").[1]

In addition to giving a borrower the right to rescind the transaction within three business

days of its consummation, the lender must also provide conspicuous notice of that right.  *See*

*Lahoud*, 2012 WL 1067391, at *7.  To do so, the lender must "clearly and conspicuously

disclose" the actual date that the rescission period expires. 12 C.F.R. § 226.23(b)(1)(v).  Whether

notice is "conspicuous" is a matter of law that is assessed using an objective standard.  *Lahoud*,

2012 WL 1067391, at *7.  If the lender fails to provide the requisite notice, the borrowers' right

to rescind extends from three business days to three years.  15 U.S.C. § 1635(f).

---

[1] There is no dispute that Smith and Wells Fargo are borrowers and lenders, respectively, covered by TILA.

In the instant case, the parties do not dispute that Wells Fargo provided conspicuous notice of Smith's right to rescind.  Wells Fargo notified Smith that she had until March 29, 2012, to rescind the agreement.  However, Smith contends that the notice was inadequate because it provided an incorrect date.

For the following reasons, I hold that Smith's right to rescission terminated on March 29, 2012.  Accordingly, Smith received proper notice under TILA and did not have three years from which to rescind her transaction.

The three-day rescission period begins on the latest of three dates: (1) the date of the transaction, (2) the date the borrower received the TILA disclosures, or (3) the date the borrower received the notice of the right to rescind.  *See Lahoud*, 2012 WL 1067391, at *7.  The date of the transaction, also known as the "consummation of the transaction," is not defined by the Act. *Murphy v. Empire of Am., FSA*, 746 F.2d 931, 933-34 (2d Cir. 1984).  However, TILA has delegated authority to the Federal Reserve Board, who has defined "consummation" as "the time that a consumer becomes contractually obligated on a credit transaction."  *Id.* at 933; *see also* Regulation Z.  Regulation Z provides that applicable state law determines the date on which a consumer becomes contractually obligated on a loan.  *Id.* at 934.

Because the loan transaction was consummated in the state of Connecticut, Connecticut law determines the date of the transaction and when the right to rescission expires.  *See id.* Under Connecticut law, a loan "is consummated when the lender and borrower sign a contract obligating them, respectively, to lend and to borrow the funds."  *Bank of New York v. Conway*, 50 Conn. Supp. 189, 200 (Super. Ct. 2006); *see Murphy*, 746 F.2d at 934 (construing a similar New York law and recognizing that consummation occurred under TILA when parties signed a contract obligating each of them to fulfill their respective promises).

6

The parties agree that Smith signed the loan documents on March 13, 2012.  Once Smith signed the documents, she obligated herself to the refinancing agreement.  *See* Note ¶ 8 (doc. # 45-1) (any person who signs the document "is fully and personally obligated to keep all of the promises made in this Note").  At that point there was nothing left for her to do in order to consummate the agreement.  Once consummated, she had three days in which to rescind her agreement.  Because Smith signed the loan documents on March 13, 2012, and was given until March 29, 2012 to rescind the agreement, Wells Fargo complied with TILA's right of rescission and notice thereof.  In fact, rather than providing the requisite three business days, Wells Fargo gave Smith approximately ten business days to rescind.  TILA does not prohibit giving a party more time to rescind the agreement—it only requires that the party have at least three business days.  *See, e.g., Hawaii Cmty. Fed. Credit Union v. Keka*, 94 Haw. 213 (2000).

Smith, contends that the loan was not consummated until March 30, 2012, the date on which Smith received a call from Wells Fargo notifying her that the loan had been approved.  However, the notice of approval is not what bound the parties to the refinancing transaction.  Although the parties did not brief the issue, at oral argument it became clear that Wells Fargo's mailing of the Mortgage Kit to Smith operated as an offer to contract—one that was accepted when Smith signed the agreement and returned it to Wells Fargo.  At that moment, both parties became bound to lend and borrow the funds, respectively.  The fact that the loan was subject to a final approval of Wells Fargo and that Wells Fargo retained some rights to cancel the transaction, *see* SAC, Ex. D at 2, does not operate to destroy the contract that had been formed by Smith's signature.  *See Murphy*, 746 F.2d at 934 ("The signing of the contract is the event of central significance.  Thereafter . . . [i]f the lender refuses to provide the loan it can be held liable to the borrower for damages.").  Smith did not plead any facts to suggest that Wells Fargo's final

approval or right to cancel was fully within its power to control.  Thus the contract was not based on an illusory promise.  *See Sicaras v. City of Hartford*, 44 Conn. App. 771, 780 (1997) ("If there is a restriction, express or implied, on the promisor's ability to terminate or to refuse to perform, the promise is not illusory.").

At oral argument, the parties raised the issue whether acceptance occurred at the time Smith signed the documents or at the moment Smith returned them to Wells Fargo.  The parties did not brief this issue and I do not rule on it today.  The parties agree that Smith was notified that she had until March 29, 2012 to rescind.  So long as the loan was consummated on or before March 26, 2012, Wells Fargo provided the requisite right to rescind.  The parties do not dispute that Smith signed and returned the documents before March 26, 2012.  Accordingly, Smith received the requisite notice of the right to rescind regardless whether the loan was consummated at the time she signed the documents or when she returned them to Wells Fargo.  Because she received proper notice, her right to rescind expired on March 29, 2012.  Her October 21, 2014 notice of rescission was untimely and her claim for enforcement of that right is dismissed.

B.  <u>Count II – Damages for Refusal to Honor Rescission Request</u>

Because Smith has not adequately alleged that she had a right to rescind her loan on October 21, 2014, she may not maintain a claim for damages resulting from Wells Fargo's refusal to honor her request.   The parties agree that Count II rises and falls with the success or failure of Count I.  Count II fails on account of Smith's failure to state a claim in Count I.

C.  <u>Count III – CUTPA Violation</u>

Count III of the SAC alleges that Wells Fargo violated CUTPA when it included non-itemized fees notwithstanding its promise of "no closing costs or hidden fees."  Lewis Letter, SAC, Ex. D.  The claimed hidden fees are two-fold: (1) the $690.93 difference between the

8

ending principal balance of the original loan and the beginning principal balance of the refinanced loan; and (2) the $495.55 difference between the escrow balance of the original loan and that of the refinanced loan.  Smith alleges that failure to disclose these discrepancies, in light of the promise of no hidden fees, amounts to a deceptive act or practice in violation of Conn. Gen. Stat. § 42-110(b).

Wells Fargo claims that Smith fails to state a CUTPA violation based on two grounds.  First, Wells Fargo contends that Smith fails to state a CUTPA claim because she fails to allege facts indicating that Wells Fargo did anything deceptive.  Second, Wells Fargo argues that any potentially viable CUTPA claim is preempted by TILA, RESPA and the NBA.

1.  *Failure to State a Claim under CUTPA*

CUTPA, as codified in section 42-110b(a) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  To state a claim under CUTPA, a plaintiff must plead that she (1) suffered an ascertainable loss of money or property, (2) that was caused by, (3) an unfair method of competition or an unfair or deceptive act in the conduct of any trade or commerce.  *Edwards v. N. Am. Power & Gas, LLC*, No. 3:14-CV-1714 (VAB), 2015 WL 4644597, at *6 (D. Conn. Aug. 4, 2015).

A plaintiff bringing a CUTPA claim may plead that an act or practice is either unfair, deceptive, or both.[2]  To interpret section 42-110b(a), courts are guided by Section 5(a)(1) of the Federal Trade Commission Act, 15 USC § 45(a)(1), as interpreted by the Federal Trade Commission ("FTC") and federal courts.  Conn. Gen. Stat. § 42-110b(b).

---

[2] Under CUTPA, deceptive practices are a subset of unfair practices such that pleading a deceptive practice will establish a claim of unfairness.  *See Edwards v. N. Am. Power & Gas, LLC*, No. 3:14-cv-1714 (VAB), 2015 WL 4644597, at *6 n.4 (D. Conn. Aug. 4, 2015) (citing *Daddona v. Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 254 (1988)).

The Connecticut Supreme Court has adopted FTC's so-called "cigarette rule," which identifies three factors used to determine whether an act or practice is unfair: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . ." *See Harris v. Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350 (2010). A practice may be considered unfair if it meets one of the criteria to a great degree or meets multiple criteria to a lesser extent. *Id.* at 351.

To the extent that Smith claims that Wells Fargo's promise of "no closing costs or hidden fees" was unfair, her claims fail. Smith has failed to satisfy any of the relevant factors set forth in the "cigarette rule."

Smith cannot satisfy the first factor because she has not alleged that the representation of "no hidden fees" is unlawful or even offensive to public policy. The fact that the amounts she claims to be "hidden" can be found elsewhere in the documents attached in support of her SAC lends support to that conclusion. For the same reason, she has not alleged any facts indicating that the Wells Fargo's promise of no hidden fees was immoral or unethical.

With regard to the third and final factor, Smith cannot point to any substantial injury that she suffered. She claims that she was charged a principal balance of $690.93 in excess of what she should have been charged. However, documents in support of her complaint show the full principal balance of $126,648.85 was disclosed to her. Further, the documents show that $637.93 was used to satisfy her April 1, 2012, interest payment obligation. It is difficult to see

how she was "substantially injured" by Wells Fargo satisfying her interest payment obligation on her behalf.

To the extent that she was not informed of the precise amount of the $53 recording fee, it is hard to imagine that the Connecticut legislature would have understood that charging such a fee would cause "substantial injury."  Smith was informed of the existence of a recording fee by way of the "Frequently Asked Questions" document ("FAQ") contained in the Mortgage Kit. *See* SAC, Ex. E.  The amount of the fee, $53, was well within the range of reasonableness for a recording fee.  Being charged a reasonable fee, the existence of which had been disclosed, does not satisfy the requirement to allege a "substantial injury."

Finally, she cannot point to any injury caused by the discrepancy in the amount of the original and refinanced escrow balances.  Yes, they differ by $495.55.   However, the amount of escrow that she owed on the refinanced loan was conspicuously disclosed in the documents attached to her complaint.  She has not pleaded adequate facts to show that she was substantially harmed by Wells Fargo's conduct of charging her for amounts that it conspicuously disclosed in the loan agreement, and that were eventually paid out by Wells Fargo for her benefit.

Smith's failure to plead that Wells Fargo engaged in an "unfair practice" does not preclude her ability to plead a CUTPA violation.  When a plaintiff "has brought allegations of a 'deceptive' trade practice . . . analysis under the 'cigarette rule' is improper."  *Tatum v. Oberg*, 650 F. Supp. 2d 185, 194 (D. Conn. 2009).  Rather, a plaintiff can plead a deceptive act or practice by establishing three elements: (1) the defendant made a representation, omission, or other practice likely to mislead consumers; (2) the plaintiff, a consumer, interpreted the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice must be have been likely to affect the plaintiff's decisions or conduct.  *Caldor, Inc. v. Heslin*,

11

215 Conn. 590, 597 (1990).  CUTPA does not require proof of intent to induce reliance.
*Edwards*, 2015 WL 4644597, at *6.

Whether a misrepresentation occurred is often a question for the factfinder.  *See Naples v.
Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 228 (2010).  However, the court may decide it as a
matter of law if it is clear that no reasonable person would be deceived by defendant's conduct.
*Compare Langan v. Johnson & Johnson Consumer Companies, Inc.*, 95 F. Supp. 3d 284, 289 (D.
Conn. 2015) (question of fact remained because there were multiple reasonable interpretations of
the language at issue, one of which could be interpreted as deceptive) *with Bentley v. Greensky
Trade Credit, LLC*, No. 3:14-cv-1157 (VAB), 2015 WL 9581730, at *16 (D. Conn. Dec. 30,
2015) (no question of fact remained because there were no reasonable interpretations of the
language at issue that could be deemed deceptive).

Furthermore, a court may determine as a matter of law whether the plaintiff has pleaded
reliance on the alleged misrepresentation.  *See Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607,
614 (1981) (requiring plaintiff to plead CUTPA claim by asserting that he purchased item as
result of unfair or deceptive practice or act).  Though specific monetary damages need not be
shown, a plaintiff cannot make out a CUTPA claim without alleging that the defendant's actions
caused her injury.  *See Aviamax Aviation Ltd. v. Bombardier Aerospace Corp.*, No. 3:08-CV-
1958 (CFD), 2010 WL 1882316, at *10 (D. Conn. May 10, 2010).

a.   Smith's CUTPA allegations related to the principal loan balance.

First, Smith alleges that Wells Fargo was deceptive when it claimed that there were "no
closing costs or hidden fees with the Wells Fargo Three-Step Refinance *SYSTEM*."  SAC ¶ 27.
Smith claims that the assertion of no hidden fees was incorrect in light of the fact that Smith was

required to pay Wells Fargo a principal that was greater than the principal balance due on the original, Raveis Loan as of March 1, 2012.

The parties do not dispute that, as of March 1, 2012, the principal balance due on the Raveis Loan was $125,957.92.  Further, the parties agree that, as a result of Smith's refinance, she was required to pay Wells Fargo a principal balance of $126,648.85.  Smith alleges that the difference between the two amounts, $690.93, amounted to a "hidden fee" that Wells Fargo had previously promised not to charge.

At oral argument, plaintiff's counsel clarified that Smith was alleging a misrepresentation, not omission.  Though sometimes improper to resolve at the motion to dismiss stage, dismissal is warranted because Smith fails to allege that any misrepresentation occurred.  In other words, Smith cannot claim a deceptive act if there was nothing deceiving about Wells Fargo's conduct.

The parties agree that the $690.93 amount in excess of the principal balance due on the Raveis Loan reflects a $53 recording fee paid to the City of Bridgeport Town Clerk and a $637.93 interest charge on the original loan that was to be paid to Raveis on or before April 1, 2012.  Wells Fargo argues that these are not hidden fees because they were reflected in the portion of the document that disclosed the total amount due.  Def.'s Mem. in Support of Mot. Dismiss at 19.

In support of its assertion that the $53 recording fee was not a "hidden fee," Wells Fargo points to the fact that it was disclosed in the FAQ contained in the Mortgage Kit.  *See* SAC, Ex. E.  Further, Wells Fargo argues that the interest charge of $637.93 cannot be a "hidden fee" because Smith was aware of her obligations to pay that amount.  As a part of the refinancing

13

agreement, Wells Fargo agreed to pay that amount on her behalf.  Accordingly, the amount was added to the total balance due on the refinanced loan.

Smith argues that she should have been given the option of making this interest payment up front rather than having it capitalized into the refinanced loan.  SAC ¶ 37.  However, she does not allege that Wells Fargo prevented her from prepaying the $637.93 that was due to Raveis on April 1, 2012.  When Wells Fargo agreed to refinance her loan, it agreed to take on all her obligations on the loan after March 1, 2012.  Among those obligations were the $637.93 interest payment due April 1, 2012, and the $125,957.92 principal remaining on the loan.  Had Smith paid Raveis the $637.93 herself, Wells Fargo would not have included it on the total balance of the refinanced loan.  Because Smith did not make the interest prepayment, it became a part of the total amount that Wells Fargo had agreed to pay on Smith's behalf.  Thus, it was not a "hidden fee."  In fact, because it was a loan obligation, one cannot reasonably classify it as a "fee."  Because Smith does not allege facts indicating that the interest charge was either "hidden" or a "fee," Smith cannot adequately allege a CUTPA violation.

Even if Smith did adequately plead that the promise of "no closing costs or hidden fees" amounted to a misrepresentation, she has not adequately alleged that the alleged deception caused her any injury.  She pleads no facts to indicate that the alleged deception was "likely to affect" her decision to take the loan.  *See Caldor*, 215 Conn. at 597.  Whether it is because Smith failed to plead a deceptive act or failed to allege that the deceptive act caused her injury, Smith fails to state a CUTPA claim with respect to the recording fee and interest payment.

b.  Smith's allegations related to the Escrow balance

Smith alleges that the escrow balance on her original loan, from Raveis, was $2,118.35.  SAC ¶ 41.  Smith asserts that, despite knowing the exact amount of her escrow balance, Wells

Fargo misrepresented the balance to be $2,613.90.  *Id.*  This misrepresentation, Smith alleges, resulted in an increase of $36.86 per month due on the refinanced loan.

Wells Fargo counters by asserting that the $2,613.90 balance was not a misrepresentation but rather a new amount that reflects Smith's current escrow obligation on the refinanced loan. Wells Fargo argues that the escrow account balance listed on the new loan is not intended to reflect the borrower's ending balance on the old loan.  Rather, it is intended to reflect the borrower's obligations on the new loan.  Def.'s Mem. in Support of Mot. Dismiss at 22.

Furthermore, Wells Fargo contends that Smith acknowledged this fact through an acknowledgment that was signed as a part of the Mortgage Kit.  The acknowledgment states that the lender "will transfer the balance in the escrow account on [the] existing loan and apply such amount as a credit towards the amount necessary to establish the escrow account on [the] new loan."  *Id.* at 23.  The agreement also states that "any deficiency in [the] new escrow account . . . will be spread out over a 12 month period . . . or, at [borrower's] option, [borrower] may pay the deficiency amount in full as described in the statement."  *Id.* at 24.

Wells Fargo asserts that the above disclosure precludes a claim that it engaged in a deceptive or unfair business practice by including an escrow balance in an amount different from the original loan's escrow balance.  An escrow account is used by lenders to collect money from the borrower that will be applied to future obligations as they come due.  This includes items such as property taxes, insurance, and condominium owners' association assessments.  12 C.F.R. § Pt. 1024, App. A (effective Dec. 30, 2011).  Smith does not plead any facts to indicate that a refinanced loan may not increase the amount of escrow balance required.  Here, it is clear that Wells Fargo applied the original escrow balance as a credit towards Smith's obligations on the

refinanced loan's escrow balance.  Smith has not alleged facts that tend to show that the discrepancy between those two amounts gives rise to a CUTPA violation.

Furthermore, to the extent that Smith's misrepresentation claim relies on what appeared on the HUD-1, the claim fails because, as defense counsel raised at oral argument, a HUD-1 is a post-transaction settlement statement.  Smith cannot claim she relied on that statement in executing the transaction because that document was created for the purpose of explaining the transaction after the fact.

### 2.  *CUTPA Preemption*

Even if Smith could allege a CUTPA claim on the basis of an omission, such a claim would be preempted by TILA, RESPA, and the NBA.  Both TILA and RESPA explicitly provide that state law is preempted to the extent that it is inconsistent with their respective disclosure requirements.  Similarly, the NBA provides that a national bank may make real estate loans without regard to state laws concerning escrow accounts, disclosures, and mortgage origination.

Smith's opposition does not contest Wells Fargo's argument regarding TILA and RESPA preemption (Smith makes no mention of these arguments).  Smith's only response to Wells Fargo's assertion of preemption can be found in Smith's general claim that the NBA does not preempt consumer protection statutes such as CUTPA.  Pl.'s Mem. in Opp. to Mot. Dismiss at 23.

The Supremacy Clause of the United States Constitution provides the basis for federal preemption of state laws.  *Boursiquot v. Citibank F.S.B.*, 323 F. Supp. 2d 350, 355 (D. Conn. 2004).  As the Second Circuit has noted:

> State law is preempted explicitly where Congress states an intent to occupy the field and to exclude state regulation.  State law is preempted implicitly where the federal interest in the subject matter regulated is so pervasive that no room remains for state action, indicating an implicit intent to occupy the field, or where

the state regulation at issue conflicts with federal law or stands as an obstacle to the accomplishment of its objectives.

*Rondout Electric, Inc. v. N.Y.S. Department of Labor,* 335 F.3d 162 (2d Cir. 2003).

A federal law will not explicitly preempt state law claims unless Congress has expressed a "clear and manifest" intent to do so.  *Wyeth v. Levine,* 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996)).  The presumption against preemption is strengthened when Congress legislates "in a field which the States have traditionally occupied." *Id.* (quoting *Lohr,* 518 U.S. at 485).  "Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area." *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41-42 (2d Cir. 1990).  However, "[t]he ordinary presumption against preemption does not apply to laws which allegedly conflict with the NBA." *New Mexico v. Capital One Bank (USA) N.A.*, 980 F. Supp. 2d 1314, 1322 (D.N.M. 2013) (citing *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996)).

a.   TILA and RESPA Preemption

Smith does not rebut Wells Fargo's arguments that TILA and RESPA preempt Smith's CUTPA claims to the extent that CUTPA would require disclosures inconsistent with TILA and RESPA.  There is no dispute that TILA contains a statutory provision expressly preempting state laws to the extent that those laws are inconsistent with TILA's provisions regarding the disclosure of information in connection with credit transactions.  15 U.S.C. § 1610(a)(1). Similarly, RESPA provides that state laws are preempted to the extent they are inconsistent with the procedures outlined in the Act.  12 U.S.C. § 2616.

Among Smith's allegations are claims that Wells Fargo should have itemized certain costs on the loan documents that it provided to her.  However, Smith neither alleges that Wells Fargo failed to make the disclosures required by TILA nor claims that it failed to properly follow

17

RESPA's procedure.  To the extent that CUPTA requires itemization of certain fees in a manner not required by TILA and RESPA, those claims are preempted.

For example, Smith alleges that Wells Fargo should have stated the Raveis Loan Escrow Balance on the HUD-1 form.  Wells Fargo argues that such a requirement would be inconsistent with RESPA because RESPA sets forth the requirements for filling out the HUD-1 form and does not require the bank to do so.

Similarly, Smith alleges that Wells Fargo should have itemized the $637.93 in accrued interest that she owed to Raveis and the $53 recording fee.  However, TILA does not require itemization of such costs.  Requiring Wells Fargo to itemize such costs on the required TILA forms would be inconsistent with TILA's requirements.

b.  NBA Preemption

Though Smith does not contest the ability of TILA and RESPA to preempt her claims, she does assert that the NBA does not preempt her claims.  In support of this, she points to case law indicating that the NBA does not preempt laws of general applicability, including those that relate to consumer protection.

The NBA gives national banks the authority to exercise all incidental powers "as shall be necessary to carry on the business of banking."  *Martinez v. Wells Fargo Home Mortgage, Inc.*, 598 F.3d 549, 554-55 (9th Cir. 2010).  The Office of the Comptroller of the Currency ("OCC") has the authority to promulgate regulations to define the "incidental powers" of national banks beyond those enumerated in the statute.  12 U.S.C. § 93a.  Accordingly, regulations by the OCC have no less preemptive effect than federal statutes.  *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

One of the OCC's regulations, 12 C.F.R. § 34.4, provides:

> A national bank may make real estate loans under 12 U.S.C. [§] 371 and § 34.4, without regard to state law limitations concerning:
>
> (6) Escrow accounts, impound accounts, and similar accounts;
>
> …
>
> (9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents;
>
> (10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

12 C.F.R. § 34.4.

Courts have held that "the requirement to make particular disclosures falls squarely within the purview of federal banking regulation and is expressly preempted." *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 726 (9th Cir. 2012). The Ninth Circuit has recognized that 12 C.F.R. § 34.4(a)(9) preempts state disclosure requirements in real estate transactions. *Id.* (citing *Martinez*, 598 F.3d at 557).

However, when a state law claim rests on an activity other than requiring certain disclosures, it may avoid preemption. *Id.* at 727. For example, though a state law cannot require a bank to make certain disclosures, it can still insist that Banks operate "free from fraud and other deceptive business practices." *Id.* The NBA will only preempt a state law claim if the state law claim seeks to set its own standards for when, absent other factors, a disclosure is required.

### c.  Smith's claim that itemized billing was required

As discussed above, to the extent that Smith claims that CUTPA requires Wells Fargo to itemize the certain amounts in the loan documents it provided to her, her claims fail. One could read Smith's SAC as alleging that Wells Fargo was required to itemize the amount of the loan it used to pay off the Raveis Loan obligation, the mortgage recording fee, and/or the discrepancy

19

between the beginning and final escrow balance.  If that is what Smith claims, those claims are preempted by a TILA, RESPA and the NBA.  Those federal statutes seek to regulate the way in which national banks enter into real estate loan transactions with consumers.  In doing so, they expressly provide that state law claims inconsistent with their rules and regulations are preempted.  Requiring greater disclosures than what those statutes require is inconsistent with Congress' effort to permit and regulate certain forms of disclosure.

**IV.      Conclusion**

For the foregoing reasons, Wells Fargo's motion to dismiss (doc. # 44) is granted.  The clerk shall enter judgment in favor of the defendant and shall close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 29th day of January 2016.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge